UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE SMITH & WESSON
HOLDING CORP. SEC. LITIG.

Civil Action No. 07-CV-30238-MAP

**DEFENDANTS' MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF RELEVANT FACTS .........................................................................4

ARGUMENT ....................................................................................................................5

   I.    PLAINTIFF FAILS TO SATISFY ITS BURDEN FOR OBTAINING
        CLASS CERTIFICATION .....................................................................................5
    A.    Plaintiff Bears The Burden Of Demonstrating The Need For A Class ...........5
    B.    Class Certification Requires A "Rigorous Analysis" ....................................6
    C.    Plaintiff's Perfunctory Motion Does Not Survive The "Rigorous
        Scrutiny" Mandated By This Circuit ..............................................................8

   II.   PLAINTIFF IS ATYPICAL AND INADEQUATE TO REPRESENT
        THE CLASS .............................................................................................................9
    A.    Plaintiff has Vested Outside Counsel with Unfettered Control and has
        taken a Passive Role in this Litigation.........................................................11
        1.    Plaintiff has a longstanding pattern of lending its name to outside
            counsel and giving them full discretion to manage its litigation. .............11
        2.    Plaintiff relies entirely on its outside lawyers overseeing and
            managing this litigation..............................................................................14
    B.    Plaintiff Lacks Knowledge of the Facts of this Case Rendering It
        Unable to Adequately Manage This Litigation .............................................16
    C.    Plaintiff's Understanding of this Litigation Conflicts with the
        Allegations Set Forth in the Complaint .......................................................21
    D.    Plaintiff's Post-Class Period Stock Purchases Preclude It From
        Serving As Class Representative ..................................................................23

   III.   CERTIFICATION OF THE PUTATIVE CLASS IS INAPPROPRIATE
        BECAUSE INDIVIDUAL ISSUES OF FACT AND LAW
        PREDOMINATE OVER COMMON ISSUES...............................................25
    A.    The Fraud-On-The-Market Presumption Is Inapplicable Here Because
        Plaintiff Cannot Establish Loss Causation ..................................................26
        1.    This Court's March 26, 2009 Memorandum & Order significantly
            limits the scope of Plaintiff's claimed misrepresentations. ......................27
        2.    Plaintiff fails to provide any evidence establishing loss causation............29
        3.    Plaintiff's claimed "truth" is nothing more than additional forward-
            looking statements that are not actionable. .................................................31
    B.    Plaintiff's Proposed Class Cannot Include Purchasers Who Sold
        SWHC Stock During the Class Period .........................................................32

CONCLUSION................................................................................................................33

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ........................................................................ 5, 26

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton, Co.,*
  2010 WL 481407, *3 (5th Cir. Feb. 12, 2010) ...................... 30, 31

*Basic v. Levinson,*
  485 U.S. 224 (1988) ........................................................................ 3, 26

*Berger v. Compaq Comp. Corp.,*
  257 F.3d 475 (5th Cir. 2001), reh'g denied, 279 F.3d 313 (5th Cir. 2002) ................. 10

*Cohen v. Laiti,*
  98 F.R.D. 581 (E.D.N.Y. 1983) ................................................... 23

*Coopersmith v. Lehman Bros.,*
  344 F. Supp.2d 783 (D. Mass. 2004) ......................................... 11

*Darvin v. International Harvester Co.,*
  610 F. Supp. 255 (S.D.N.Y. 1985) ............................................. 23

*Dura Pharmaceuticals, Inc. v. Broudo,*
  544 U.S. 336 (2005) ................................................... 27, 30, 32

*Feder v. Elec. Data Sys. Corp.,*
  429 F.3d 125 (5th Cir. 2005) ...................................................... 11

*Fletcher v. Atex, Inc.,*
  68 F.3d 1451 (2d Cir. 1995) .......................................................... 9

*Gariety v. Grant Thornton, LLP,*
  368 F.3d 356 (4th Cir. 2004) ....................................................... 7

*General Telephone Co. of Southwest v. Falcon,*
  457 U.S. 147 (1982) ........................................................................ 6

*Greenberg v. Crossroads Sys., Inc.,*
  364 F.3d 657 (5th Cir. 2004) ..................................................... 30

*Griffin v. GK Intelligent Sys., Inc.,*
  196 F.R.D. 298 (S.D. Tex. 2000) ............................................... 11

*Howard Gunty Profit Sharing Plan v. Carematrix Corp.,*
  354 F. Supp.2d 18 (D. Mass. 2000) ........................................... 11

*In re Bank of Boston Corp. Securities Litig.,*
  762 F. Supp. 1525 (D. Mass. 1991) ........................................... 10

*In re Boston Scientific Corp. Securities Litig.,*
  604 F. Supp.2d 275 (D.Mass. 2009) ......................... 10, 26, 27, 30

*In re Carbon Black Antitrust Litig.*,
2005 U.S. Dist. LEXIS 660, *42 (D.Mass. Jan. 18, 2005) ............................................ 5

*In re Cardinal Health Sec. Litig.*,
226 F.R.D. 298 (S.D.Ohio 2005) ............................................................................... 23

*In re Cornerstone Propane Partners, L.P. Securities Litigation*,
2006 WL 1180267, *8 (N.D. Cal. May 3, 2006) ........................................................ 33

*In re Credit Suisse-AOL Securities Litig.*,
253 F.R.D. 17 (D.Mass. 2008) .......................................................................... 9, 10, 26

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3rd Cir. 2008) ..................................................................................... 8

*In re PolyMedica Corp. Securities Litig.*,
432 F.3d 1 (1st Cir. 2005) .............................................................................. 9, 26, 29

*In Re Pub. Offering Sec. Litig.*,
471 F.3d 24 (2nd Cir. 2006) ...................................................................................... 30

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D.PA 2003) ............................................................................. 24, 26

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
604 F. Supp.2d 332 (D.Mass. 2009) ........................................................................... 1

*In re Sonus Networks Securities Litig.*,
229 F.R.D. 339 (D.Mass. 2005) ................................................................................. 11

*In re Xcelera.com Securities Litig.*,
430 F.3d 503 (1st Cir. 2005) ..................................................................................... 29

*Ironworkers Local No,.*
25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC, 616
F. Supp. 2d 461 (S.D.N.Y. 2009) ............................................................................... 13

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001) ....................................................................................... 7

*Key v. Gillette Co.*,
782 F.2d 5 (1st Cir. 1986) ........................................................................................ 10

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ...................................................................................... 7

*Monster Worldwide*,
251 F.R.D. 132 (S.D.N.Y. 2008) ............................................................................... 17

*New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*,
244 F.R.D. 79 (D. Mass. 2007) .............................................................................. 6, 26

*Oscar Private Equity Investments v. Allegiance Telecom., Inc.*,
487 F.3d 261 (5th Cir. 2007) ............................................................................ 7, 27, 30

*Rocco v. Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................................... 25

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
    136 F.R.D. 658 (D. Or. 1991) ................................................................ 12

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
    323 F.3d 32 (1st Cir. 2003) ........................................................... 5, 6, 9

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D.Mass. 2005) ............................................................. 9

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001), cert. denied, 534 U.S. 951 (2001) ................. 8

*Tardiff v. Knox County*,
    365 F.3d 1 (1st Cir. 2004) .................................................................... 7

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) .................................................... 17, 18

*Waste Management Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ................................................................. 6

## **Federal Statutes**

15 U.S.C. § 78u-5 ................................................................................ 5

H.R. Conf. Rep. No. 104-369 ........................................................... 16, 18

Pub. L. No. 104-67,109 Stat. 737 ......................................................... 4

## **Federal Rules**

Fed. R. Civ. P. 23 ...................................................................... passim

Fed. R. Civ. P. 23(a) ........................................................................... 6

Fed. R. Civ. P. 23(a)(3) ...................................................................... 12

Fed. R. Civ. P. 23(a)(3)-(4) ................................................................. 11

Fed. R. Civ. P. 23(b) ........................................................................... 9

Fed. R. Civ. P. 23(b)(3) ............................................................... passim

Defendants Michael F. Golden ("Golden"), John A. Kelly ("Kelly"), and Smith & Wesson Holding Corporation ("SWHC" or the "Company") (collectively "Defendants") submit the following Memorandum of Law in Opposition to Lead Plaintiff, Oklahoma Firefighters Pension and Retirement System's ("Plaintiff" and/or the "Oklahoma Fund") Motion for Class Certification (the "Motion") and supporting Memorandum of Law ("Pl. Memo.").

## PRELIMINARY STATEMENT

Plaintiff's Motion and supporting Memorandum of Law show that it regards class certification as little more than a rubber stamp in this Circuit.  Indeed, Plaintiff attempts to avoid setting forth the basic facts needed to survive the "rigorous analysis" that this Court mandates as to each Rule 23 requirement by implying (erroneously) that such analysis is not necessary because securities fraud cases are "routinely" certified as class actions [Pl. Memo. at p. 13], and that "it is clear" that common questions predominate over individual issues in this case.  [Pl. Memo. at 14].  Conclusory self-serving statements such as these are not enough to support certification of the putative class. Accordingly, Plaintiff's Motion should be denied.

In its Memorandum and Order Regarding Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint dated March 26, 2009 [Docket No. 71] ("Order"),[1] this Court found that "a very large number, probably the majority of statements Plaintiffs cite in the Complaint in support of their claims are forward-looking and not actionable."  *See* Order, pp. 1, 30 (emphasis added).  In moving for class certification, however, Plaintiff essentially ignores this Court's narrowing of the putative

---

[1]  *See* In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp.2d 332 (D. Mass. 2009).  A true and accurate copy of the Order is attached as Exhibit A to the Declaration of John A. Sten in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification ("Sten Decl.").

class' claims.  Indeed, Plaintiff brings its Motion as if this Court's Order was mere dicta -
- without any effect or impact on the putative class.  That is error.  While Plaintiff
managed to narrowly survive outright dismissal of its Complaint at the pleading stage, the
threshold to certify a class is a far more rigorous task, allowing the Court to look beyond
the mere allegations contained in the Complaint and to engage in a rigorous inquiry to
test: (1) disputed premises; (2) the viability of asserted theories; and (3) to ensure that
Plaintiff is not misusing the certification process to effectively "bully" Defendants into
settling an unmeritorious case.  That analysis is especially pertinent here, where Plaintiff
does little more than regurgitate the same allegations upon which the Complaint is based
-- the majority of which this Court has found to be non-actionable.  Self-serving
statements are not evidence, and they cannot be the sole support for class certification.

        Notwithstanding Plaintiff's over-reliance on the pleadings and its failure to put
forth any supporting evidence or expert testimony as to why class certification is
appropriate here, Plaintiff's Motion should be denied on numerous other grounds.  First,
Plaintiff has failed to satisfy the "adequacy" and "typicality" prongs of Rule 23(a).  The
"typicality" prong requires Plaintiff to establish that its claims are typical of the claims of
the putative class and that its injuries arise from the same events or course of conduct.
The adequacy prong requires Plaintiff to, *inter alia*, establish that its interests are aligned
with the other putative class members and that no conflicts of interest exist.  Both of
these prongs may be defeated when, as here, the purported class representative is subject
to "unique defenses" which threaten to become the focus of the litigation.  Plaintiff is
subject to many unique defenses including, but not limited to:  (1) vesting counsel with
unfettered control of this litigation; (2) failing to take an active role in this litigation; (3)

lacking knowledge and familiarity of the specific allegations asserted in the Complaint; and (4) inconsistent testimony with regard to the allegations asserted in the Complaint.

In addition, and despite Plaintiff's assertions to the contrary, Plaintiff cannot rely on the fraud-on-the-market presumption (set forth in Basic v. Levinson, 485 U.S. 224, 248 (1988)), to establish reliance on a class-wide basis because it has failed to establish the loss causation element of its claim. As discussed more fully below, absent putting forth the basic facts showing loss causation at this stage of the proceedings, Plaintiff cannot rely on the "fraud-on-the-market presumption." Individual issues of reliance therefore predominate over common issues, precluding class certification of the proposed class under Fed. R. Civ. P. 23(b)(3).

Finally, Plaintiff proposes a class of plaintiffs that is overbroad on two fronts. First, the proposed class includes purchasers of SWHC stock who subsequently sold their holdings during the class period. Those putative plaintiffs cannot show loss causation under applicable U.S. Supreme Court precedent and should be excluded from any class. Second, Plaintiff proposes a class whose scope goes beyond Plaintiff's allegation that SWHC made its so-called first "corrective disclosure" on October 29, 2007. Because reliance is not demonstrated or presumed past that date, any class period must end there.[2] For all these reasons, and as more fully explained below, Plaintiff's Motion should be denied.

---

[2] Plaintiff tries to avoid this result by phrasing that SWHC's October 29, 2007 disclosure as only "partial." Comparing SWHC's October 29, 2007 disclosure with its December 6, 2007 disclosure reveals that the only new piece of information contained therein is a forward-looking statement. It is not a correction of any past fact, but a prediction of the future -- which this Court has already found to be non-actionable.

## STATEMENT OF RELEVANT FACTS

Plaintiff's purported class action securities fraud claims are premised upon the allegation that, from June 2007 to December 2007, Defendants projected a favorable financial outlook for the Company's fiscal year 2008 (ending April 30, 2008) while in possession of facts and information in the Winter and Spring 2007 that allegedly predicted declining demand for the Company's products. *See, e.g.,* Complaint at ¶¶ 1, 3, 122. Specifically, Plaintiff seeks certification of a class of persons and entities that purchased publicly traded Smith & Wesson Holding Corp. securities between June 14, 2007 and December 6, 2007 (the "Class Period"). Id.; *see also* Pl. Memo., p. 1.

Plaintiff alleges that Defendants made material misrepresentations in press releases on June 14, 2007, and September 6, 2007, in two conference calls on those same dates, and in the Company's 2007 Form 10-K, filed with the Securities and Exchange Commission ("SEC") on July 16, 2007. *See* Complaint at ¶¶ 104-121. These alleged misrepresentations, however, are almost entirely "forward-looking statements"[3] protected under the statutory safe harbor created under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67,109 Stat. 737 ("PSLRA"). *See* 15 U.S.C. § 78u-5. Indeed, as this Court acknowledged in its March 26, 2009 Order, "[t]he statutory safe harbor provisions of the PSLRA immunized Defendants from liability for forward-looking statements because they included meaningful cautionary statements." *See* Order, p. 2. The Court further acknowledged that: (1) "Smith & Wesson repeatedly warned investors

---

[3]  For purpose of the PSLRA, a forward-looking statement includes any one of the following: (i) a statement containing a projection of revenues, income, earnings per share, capital expenditures, or other financial items; or (ii) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; or (iii) a statement of future economic performance; or (iv) any statement of the assumptions underlying or relating to the preceding statements. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D).

that results might vary substantially from these projections"; (2) the cautionary statements "fully satisfy the requirements of the PSLRA"; (3) "[t]he statements are extensive and cover the ground identified by Plaintiffs as relevant"; (4) they "warn, in clear language, that statements regarding expected projected profits and demand are merely predictions that are subject to risk." Id. at p. 19 (concluding "the cautionary statements prong of the safe harbor is itself sufficient to render Defendants' forward-looking statements non-actionable."). As a result of this Order, the only allegations in the Complaint to survive are the purportedly false statements "of present or historical fact." See Order at p 20. It is upon these few remaining allegations -- and nothing more -- that Plaintiff must now rely to justify class certification.[4]

## ARGUMENT

### I.    PLAINTIFF FAILS TO SATISFY ITS BURDEN FOR OBTAINING CLASS CERTIFICATION

#### A.    Plaintiff Bears The Burden Of Demonstrating The Need For A Class

As a threshold matter, Plaintiff bears the burden of putting forth basic facts demonstrating all elements of Fed. R. Civ. P. 23. See In re Carbon Black Antitrust Litig., 2005 U.S. Dist. LEXIS 660, *42 (D.Mass. Jan. 18, 2005) (noting the burden of proof under Rule 23 "rests squarely on the plaintiffs."). A plaintiff seeking class certification must demonstrate that the proposed class satisfies each of the four requirements of Fed. R. Civ. P. 23(a) -- numerosity, commonality, typicality, and adequacy. See Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 38 (1st Cir. 2003) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997)).[5]

---

[4]  As discussed more fully below in Section II, infra, the threshold to certify a class is far more rigorous than the motion to dismiss stage.

[5]  Under Rule 23(a), Plaintiff must establish that: (1) the class is so numerous that joinder is impracticable;

Plaintiff also must satisfy at least one of the three sub-parts of Rule 23(b).  Id. Plaintiff seeks certification under Rule 23(b)(3).  It must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy… ."  *See* Fed. R. Civ. P. 23(b)(3) (2010).  The question of certification includes an assessment of the "difficulties likely to be encountered in the management of a class action" and is "far more demanding than the commonality requirement of Rule 23(a)."  Id.; *see also* New Eng. Carpenters Health Bens. Fund v. First Databank, Inc., 244 F.R.D. 79, 84 (D. Mass. 2007) (internal citation omitted).

### B.        Class Certification Requires A "Rigorous Analysis"

As set forth by the Supreme Court and the First Circuit, this Court may only certify a class "after a 'rigorous analysis'" confirming that the plaintiff has met the requirements of Rule 23.  *See* General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982); *accord* Smilow, 323 F.3d at 38 (noting that in deciding to certify a class "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23."). This Court must go beyond Plaintiff's mere allegations and closely examine the facts relevant to class certification.  *See* Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 297-98 (1st Cir. 2000) (acknowledging "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" and that "a district court must formulate some prediction as to how specific

---

(2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. P. 23(a) (2010).

issues will play out in order to determine whether common or individual issues predominate in a given case."); *see also* <u>Tardiff v. Knox County</u>, 365 F.3d 1, 4, 6 (1st Cir. 2004) (noting at the class certification stage, the "court has the power to test disputed premises," and should "proceed based on its reasonable best guess as to what will happen."); <u>In re Carbon Black Antitrust Litig.</u>, 2005 U.S. Dist. LEXIS 660, *43, n.10 (D.Mass. 2005) (concluding the court may assess the "entire record" when ruling on a class certification motion).

The majority of Circuits addressing this issue conclude that merely accepting Plaintiffs' allegations as true constitutes reversible error.  *See e.g.* <u>McLaughlin v. Am. Tobacco Co.</u>, 522 F.3d 215, 222 (2d Cir. 2008) (court may not certify a class without making a ruling that each Rule 23 requirement is met and all evidence must be assessed "whether or not any such assessment also bears on the merits of the case."); <u>Johnston v. HBO Film Mgmt., Inc.</u>, 265 F.3d 178, 188 (3d Cir. 2001) (noting that "not only was it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision."); <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 365 (4th Cir. 2004) (noting "[i]f it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of [Rule 23] would automatically lead to a certification order, frustrating the district court's responsibilities for taking a 'close look' at relevant matters.") (internal citation omitted); <u>Oscar Private Equity Investments v. Allegiance Telecom., Inc.</u>, 487 F.3d 261, 268 (5th Cir. 2007) ("A district court still must give full and independent weight to each Rule 23 requirement, regardless of whether that requirement overlaps with the merits."); <u>Szabo v. Bridgeport Machs.</u>,

Inc., 249 F.3d 672, 675-76 (7th Cir. 2001), cert. denied, 534 U.S. 951 (2001) ("The

proposition that a district judge must accept all of the complaint's allegations when

deciding whether to certify a class cannot be found in Rule 23 and has nothing to

recommend it.").  The Szabo Court further explained that:

> The reason why judges accept a complaint's factual allegations when ruling on
> motions to dismiss under 12(b)(6) is that a motion to dismiss tests the legal
> sufficiency of a pleading.  Its *factual* sufficiency will be tested later -- by a motion
> for summary judgment under Rule 56, and if necessary by trial.  By contrast, an
> order certifying a class usually is the district judge's last word on the subject;
> there is no later test of the decision's factual premises (and, if the case is settled,
> there could not be such an examination even if the district judge viewed the
> certification as provisional).  Before deciding whether to allow a case to proceed
> as a class action, therefore, a judge should make whatever factual and legal
> inquiries are necessary under Rule 23.

Szabo, 249 F.3d at 675-76.

### C.    Plaintiff's Perfunctory Motion Does Not Survive
### The "Rigorous Scrutiny" Mandated By This Circuit

While it may have been sufficient for Plaintiff to simply rely upon the

Complaint's allegations at the motion to dismiss stage, the class certification stage

presents a much higher hurdle, the predominance prong of Fed. R. Civ. P. 23(b) is often

met in securities fraud cases, "it does not follow that a court should relax its certification

analysis, or presume a requirement for certification is met, merely because a plaintiff's

claims [allege a securities fraud violation]."  *See* In re Hydrogen Peroxide Antitrust

Litig., 552 F.3d 305, 322 (3rd Cir. 2008) (noting that while a putative class may assert a

type of claim that "'typically' involves common questions of law or fact, 'careful

attention to the requirements of [Fed. R. Civ. P. 23] remains … indispensable.'") (internal

citation omitted).  That is precisely what Plaintiff urges this Court to do here, where it

relies upon nothing more than allegations in the Complaint that this Court has concluded

are not actionable.  Such conclusory, self-serving statements are not evidence and they

cannot support class certification.  *See* <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir.

1995) (noting "mere conclusory allegations … are not evidence …").

   This Court is under an independent obligation to test for "<u>actual</u>, not presumed

conformance with [Fed. R. Civ. P. 23]" and cannot simply accept Plaintiff's allegations

as true or "incontestable."  It must conduct a "rigorous analysis" and engage in a detailed

factual and legal inquiry to determine whether class certification is appropriate.  *See* <u>In re</u>

<u>PolyMedica Corp. Securities Litig.</u>, 432 F.3d 1, 6 (1st Cir. 2005) (noting that when

conducting its analysis, a district court is "entitled to look <u>beyond the pleadings</u> in its

evaluation of the applicability of the fraud-on-the-market presumption of reliance, and its

resolution of the class-certification question.") (emphasis added); *see also* <u>Smilow</u>, 323

F.3d at 38 (noting a class action may only be certified if the trial court is satisfied, after a

rigorous analysis, that the prerequisites of Rule 23 have been satisfied).[6]

## II.    PLAINTIFF IS ATYPICAL AND <u>INADEQUATE TO REPRESENT THE CLASS</u>

   Plaintiff is subject to a myriad of unique defenses that render it atypical of absent

class members and that prevents its adequate representation of their interests.

"Both typicality and adequacy may be defeated where the class representatives are

subject to "unique defenses which threaten to become the focus of the litigation."  *See* <u>In</u>

<u>re Credit Suisse-AOL Securities Litig.</u>, 253 F.R.D. 17, 23 (D.Mass. 2008) (internal

citation omitted); *see also* <u>Swack v. Credit Suisse First Boston</u>, 230 F.R.D. 250, 260

(D.Mass. 2005) ("An examination of potential unique defenses is necessary as part of the

---

[6]  In fact, this Court was careful to note in its March 26, 2009 Order that "[t]he subtlety of the statutory framework, and the delicacy of the necessary analysis, requires this Court to distinguish carefully between non-actionable forward-looking statements and potentially actionable statements of present or historical fact."  *See* Order at p. 17.  A careful analysis such as this is even more crucial at the class certification stage, where this Court must look beyond the mere allegations asserted in the Complaint to determine whether Plaintiff has satisfied the prerequisites of Fed. R. Civ. P. 23.

typicality analysis because 'where a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class.'") (internal citation omitted).[7]

Plaintiff falls short of meeting the typicality requirements necessary to certify a class under Fed. R. Civ. P. 23(a)(3). Plaintiff must establish that its claims or defenses are "typical of the claims or defenses asserted by the class" and "that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class." *See* Fed. R. Civ. P. 23(a)(3); *see also* In re Boston Scientific Corp. Securities Litig., 604 F. Supp.2d 275, 281-82 (D. Mass. 2009) (internal citation omitted). This inquiry is one of the most important requirements of Rule 23(a) because, once a court certifies a class, the class representatives will represent not only their own interests, but the interests of all absent class members. *See* Key v. Gillette Co., 782 F.2d 5, 7 (1st Cir. 1986) ("One of the most important of [the Rule 23(a)] requirements is that the representative party will fairly and adequately represent the interests of the class."[8]

---

[7]  Fed. R. Civ. P. 23 requires that class representatives be "adequate" representatives of the putative class and that its claims are "typical" of those of the claims asserted by the class. *See* Fed. R. Civ. P. 23(a)(3)-(4). Because this Court's analysis of these requirements "tend to merge," they are addressed jointly here. *See* In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. at 22-23 (noting the "typicality" and "adequacy" requirements involve a similar, overlapping analysis).

[8]  This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff.") (citation omitted); Berger v. Compaq Comp. Corp., 257 F.3d 475, 481 (5th Cir. 2001), reh'g denied, 279 F.3d 313 (5th Cir. 2002) ("Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy."). To assess Rule 23(a)(4)'s adequacy requirement "[t]he court must determine, first whether any potential conflicts exist between named plaintiffs and the prospective class members and, second, whether the named plaintiffs and their counsel will prosecute the case vigorously. *See* In re Bank of Boston Corp. Securities Litig., 762 F. Supp. 1525, 1534 (D. Mass. 1991).

A.   **Plaintiff has Vested Outside Counsel with Unfettered
Control and has taken a Passive Role in this Litigation**

Plaintiff is nothing more than a pawn for two outside law firms who are "actually
controlling this litigation." In re Sonus Networks Securities Litig., 229 F.R.D. 339, 342
(D. Mass. 2005) (noting a plaintiff in a securities class action must be "qualified to
perform the crucial responsibility of a class representative, directing and controlling the
litigation rather than unduly deferring to lead counsel."). The PSLRA mandates that
"securities class actions be managed by active, able class representatives who are
informed and can demonstrate they are directing the litigation." Feder v. Elec. Data Sys.
Corp., 429 F.3d 125, 130 (5th Cir. 2005) (internal citation omitted); see also In re Sonus
Networks, Inc. Securities Litig., 229 F.R.D. at 347 (concluding that it was in "the
administration of justice to give integrity to the PSLRA's mandate that litigants not
lawyers direct and control class action litigation."); Howard Gunty Profit Sharing Plan v.
Carematrix Corp., 354 F. Supp.2d 18, 23 (D. Mass. 2000) (noting the "whole point of the
[PSLRA provisions] was to install a lead plaintiff with substantive decision making
ability and authority, instead of permitting attorneys to direct the litigation process.")
(internal quotations omitted); Coopersmith v. Lehman Bros., 344 F. Supp.2d 783, 788 (D.
Mass. 2004) (noting one objective of the PSLRA "was to ensure more effective
representation of investors in securities fraud class actions by transferring control of the
litigation from the attorneys to the investors.") (internal quotation omitted).

1.   **Plaintiff has a longstanding pattern of lending its name to outside
counsel and giving them full discretion to manage its litigation.**

Class certification must be denied where, as here, the proposed class
representative is merely lending its name to a lawsuit for its counsel to pursue. See e.g.
Griffin v. GK Intelligent Sys., Inc., 196 F.R.D. 298, 302 (S.D. Tex. 2000) (denying class

certification after finding that class representatives: "were solicited for this lawsuit and have taken little or no supervisory role over lead counsel."); *see also* <u>Rolex Employees Ret. Trust v. Mentor Graphics Corp</u>., 136 F.R.D. 658, 666 (D. Or. 1991) (denying motion for class certification where the class representative "did not become involved in the case until after the basic groundwork had been laid … [and where he] contributed nothing to the drafting of the complaint.").

It was outside counsel for Plaintiff (Berman DeValerio), who contacted Plaintiff and encouraged it to pursue lead plaintiff status -- not the other way around.[9]  When asked how this litigation first originated, Mr. Jones (the Executive Director of the Oklahoma Fund and Plaintiff's Rule 30(b)(6) designee), emphatically responded: "Oh, absolutely.  Berman DeValerio is the one who brought it to our attention."  *See* Jones Dep., pp. 139 [line 25], 140 [line 1].  Plaintiff did not even know it had ever purchased or sold Smith & Wesson common stock up until that time.[10]

In the deposition testimony of Robert E. Jones, Jr., the Executive Director of the Oklahoma Fund,  Mr. Jones testified that the Board of Directors of the Oklahoma Fund approves a list of securities litigation firms and "allow[s] them to review [the Fund's] transactions" and to present potential litigation opportunities to the Fund.  If the Fund decides to pursue that opportunity, it uses the presenting securities litigation firm as its lawyers.  *See* Deposition of Robert E. Jones, Jr. (February 23, 2010) ("Jones Dep."), at pp. 28 [line 19] through p. 30 [line 6].  A true and accurate copy of the deposition

---

[10]  Only one of the approximately eighteen (18) money managers employed by the Oklahoma Fund, Waddell & Reed, bought and sold Smith & Wesson common stock.  *See* Jones Dep., pp. 22 [line 25], 23 [lines 1-3].  Waddell & Reed, Plaintiff's small-cap growth equity manager, had absolute discretion to buy and sell small-cap securities on behalf of Plaintiff.  *See e.g.* Jones Dep., pp. 26 [lines 4-8], 118 [line 24]; 122 [lines 23-25], 123 [line 1].

transcript for Robert E. Jones, Jr. is attached as Exhibit B to the Sten Decl.  This is precisely the type of lawyer-driven litigation that the PLSRA was enacted to control. Courts acknowledge that such an arrangement "creates a clear incentive" for outside counsel to "discover 'fraud' in the investments it monitors" and that such a practice "fosters the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail."  *See, e.g.*, Ironworkers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC, 616 F. Supp. 2d 461,464-466 (S.D.N.Y. 2009) (concluding the Fund was "in no position to adequately monitor the conduct of [the] complex litigation when it [had] not even taken the necessary steps to assure itself that the advice it [was] getting from its monitors [outside counsel was] disinterested, let alone take the necessary steps to find out much about the lawsuit it [was] being asked to oversee.").

It is also worth noting that while Mr. Jones repeatedly refers to the Oklahoma Fund's "general counsel" as being in charge of the litigation, it is an independent outside law firm servicing many different clients.[11]  The Oklahoma Fund has no in-house counsel.[12]  Mr. Jones has identified Marc Edwards, Esq. of Phillips Murrah as Oklahoma Fund General Counsel.  *See* Jones Dep., pp. 29 [lines 9-10]; 48 [lines 10-25].  Despite this designation, however, Mr. Edwards is not an employee of the Oklahoma Fund.  In fact, the Fund is only one of many clients represented by Mr. Edwards.  Indeed, when asked to elaborate on the "normal docket" of the Oklahoma Fund's "general counsel," Mr. Jones acknowledged that the Fund is "not his only client" and that Mr. Edwards has many "other clients."  Id., [lines 4-9].

---

[12] Mr. Jones is an attorney, but not a practicing attorney.  *See* Jones Dep., p. 49 [lines 21-25].

In addition to its above-referenced actions rendering it unfit to be lead plaintiff, the Oklahoma Fund's extensive experience in prior securities litigation refutes any notion that it is "typical" of the putative class. Indeed, Congress, in the PSLRA, took aim at "professional plaintiffs" who repeatedly partner with "entrepreneurial trial lawyers" to file abusive class action lawsuits in case after case. *See* H.R. Conf. Rep. No. 104-369, at 32 (1995); H.R. Rep. No. 104-50, at 16 (1995). In the last five years, the Oklahoma Fund has sought to be named lead plaintiff in no less than <u>seven</u> class action lawsuits (the majority securities fraud class actions) with Berman DeValerio serving as counsel for Plaintiff in two of those actions.[13] Berman DeValerio also served as counsel for Plaintiff in <u>Wyatt, et al. v. El Paso Corp</u>. 02-CV-2717 (S.D. TX) -- where Plaintiff served as the representative plaintiff of a distinct sub-class of class plaintiffs. *See* Jones Dep., p. 34, [lines 6-25]. In each of those instances, Mr. Jones acknowledged that it was Berman DeValerio who contacted them with the litigation opportunities. *See* Jones Dep., p 36 [lines 6-10].

### 2. Plaintiff relies entirely on its outside lawyers overseeing and managing this litigation.

Plaintiff's lack of input and general lack of involvement is further evidenced by testimony that the Oklahoma Fund left all of the litigation decisions in this case exclusively within the hands of its attorneys. For example, neither Mr. Jones nor anyone

---

[13] *See e.g.* <u>Mizzaro v. Home Depot, Inc.</u>, Case No. 06-CV-11510 (N.D. GA); <u>In re Brocade Comms. Systems, Inc.</u>, Case No. 05-CV-02042 (N.D. CA); <u>In re Epix Pharmaceuticals, Inc. Sec. Litig.</u>, Case No. 05-CV-10166 (D. MA); <u>In re JDS Uniphase Corp. Sec. Litig.</u>, Case No. 02-CV-01486 (N.D. CA); <u>In re Sunrise Senior Living, Inc.</u>, Case No. 07-CV-00102 (D. D.C.); <u>In re Vitesse Semiconductor Corp. Sec. Litig.</u>, Case No. 06-CV-2639 (C.D. CA); and <u>Stock v. Shuffle Master, Inc., et al.</u>, Case No. 07-CV-00715 (D. NV). These and other matters involving Plaintiff (as either a party and/or witness) are included in Response No. 12 of the Amended Objections and Responses of Lead Plaintiff to Defendants' Request for Interrogatories. A true and accurate copy of "Exhibit No. 3" from the Jones Deposition [Amended Objections and Responses of Lead Plaintiff to Defendants' Request for Interrogatories, Response No. 12], is attached as <u>Exhibit C</u> to the Sten Decl.

from the Oklahoma Fund (even his so-called "general counsel") apparently had any role in preparing the Complaint or verifying that the facts contained therein were accurate. That was all delegated exclusively to class counsel:

Question:     [W]hat actual role did you play in drafting the Complaint [?]

Answer:       I did not take any role in drafting the Complaint.

Question:     Did the Oklahoma Fund?

Answer:       No.

                    *              *              *              *

Question:     [Did you] [m]ake any changes to the Complaint as a result of your review, do you recall that?

Answer:       No, I don't believe I made any changes.

Question:     Okay.  Now did the Oklahoma Fund conduct any review of Smith & Wesson's public filings to confirm the accuracy of the facts contained in the Consolidated Class Complaint prior to its filing?

Answer:       No. We relied on our securities litigation firm … No we did not separately verify.  You're asking me did I verify, separately verify what they did?

Question:     Yeah, that the facts as contained in the Complaint are accurate?

Answer:       No.  No.  We relied on their representations.

Question:     Did the Oklahoma Fund conduct any review of Smith & Wesson's press releases to confirm the accuracy of the contents by the Consolidated Complaint prior to its filing?

Answer:       No.  We deal with them just like we deal with our investment managers, we leave them to prepare the accuracy and we rely on them for the accuracy.

                    *              *              *              *

Question:     [D]id the Oklahoma Fund conduct any review of Smith & Wesson's conference call transcripts prior to the filing of the Complaint in order to confirm the accuracy of the facts contained

in the Consolidated [Complaint]?

Answer:      No, did not.

＊                ＊                ＊                ＊

Question:    Is it your understanding it was Berman DeValerio who spoke to
             these people? [referring to unnamed former SWHC employees
             referenced in the Complaint]

Answer:      No, I'm not sure who spoke to them.

Question:    Were you ever told who spoke to them?

Answer:      No.

Question:    Were you ever told where this information came from?

Answer:      Specifically, no, I don't believe so.

Question:    Okay … would your answer be the same as to [the] former director
             of retail sales in paragraph 37?

Answer:      Yes, I have no idea who any of these people are.

Jones Dep., pp. 133 [Lines 15-20], 134 [Lines 6-14, 22-25], 135 [Lines 1-10], 136 [lines

5-10], 165 [lines 12-24].

Mr. Jones likewise acknowledges that when Plaintiff claims to "direct and

control" this litigation, all it really means is deferring to outside counsel:

Question:    So, I'm just curious what your duties and responsibilities are [as
             lead plaintiff].

Answer:      Let me expand then.  I have a duty not to show favoritism to our
             loss as compared to the other members of the class.  I have a duty
             to keep expenses down to a minimum in relationship to the, in the
             litigation.  I have a duty to insure that I have competent counsel
             representing the class.  Duties such as that.

Question:    What about your duties in overseeing the prosecution of the action
             for the class?

Answer:        I would say I covered that when I said insuring that I had
               competent attorneys doing that.

Jones Dep., pp. 44 [line 25], 45 [lines 1-12].

**B.    Plaintiff Lacks Knowledge of the Facts of this Case
        Rendering It Unable to Adequately Manage This Litigation**

Plaintiff's lack of knowledge relative to these proceedings and the basic

allegations of its Complaint is fatal to its bid for class certification.  A motion for class

certification should be denied where the proposed class representative is unfamiliar with

the allegations asserted in the underlying complaint.  *See* In re Monster Worldwide

Securities Litig., 251 F.R.D. 132, 136 (S.D.N.Y. 2008) (finding plaintiff inadequate

where Co-Chairman of plaintiff fund knew nothing of the underlying case); *see also*

Wagner v. Barrick Gold Corp., 251 F.R.D. 112, 118 (S.D.N.Y. 2008) (Although "in

complex actions such as securities actions, a plaintiff need not have expert knowledge of

all aspects of the case to qualify as a class representative, and a great deal of reliance on

the expertise of counsel is to be expected," still the proposed class representative must be

"aware of the basic facts underlying the lawsuit and…not…likely to abdicate his

obligations to fellow class members.") (internal citation omitted).

Plaintiff contends that its ability to represent the class is "beyond dispute" and

"[w]ithout a doubt" it possesses the necessary skills to manage this litigation simply

because the Oklahoma Fund is an institutional investor and, on the surface, fits the profile

of the kind of lead plaintiff contemplated by Congress under the PSLRA.  However, the

deposition testimony of Mr. Jones overwhelmingly demonstrates his (and Plaintiff's) lack

of responsibility and knowledge concerning the underlying allegations asserted on behalf

of the putative class it hopes to represent.  The testimony also demonstrates that the

Oklahoma Fund has no knowledge of the facts of this case except what it has been told

-17-

by class counsel (Berman DeValerio) and what Mr. Jones gleaned from the pleadings when preparing for his deposition. For example, when asked what was meant by the Complaint's use of the phrase "precipitous drop in demand," Mr. Jones simply stated: "I meant that – well number one, I didn't write this. But what's my understanding of it, I mean, I didn't write it." Jones Dep., p. 137 [lines 13-22]. Similarly, when asked what was meant by the Complaint's use of the phrase "steady decline in demand," Mr. Jones responded: "Well, those are phrases that were developed by whoever drafted this document, they're not my words." Id. at p. 151 [lines 11-17].

When asked if he recognized the December 6, 2007 press release issued by the Company -- a document repeatedly referenced (and relied upon) by the Complaint [¶¶ 11, 125, 150], Mr. Jones responded "I don't recall ever seeing it, no." *See* Jones Dep., p. 196 [line 13]. Not surprisingly, when asked if he could identify the purported "correction" in the Company's December 6, 2007 press release, Mr. Jones responded "[I]'m not sure we're alleging that there is anything. From my perspective I'm just going to let the Complaint speak for itself. I'm not here to make additional complaints outside of the Complaint." Id. at p. 205 [lines 18-22]. When asked to clarify, Mr. Jones stated: "Well, I mean, my answer's going to be to start reading from the Complaint, is that what you want me to do … I don't know what else to add other than what's stated in the Complaint." Id. at p. 206 [lines 2-9].

In other instances where Mr. Jones did answer questions regarding the allegations in the Complaint, it was clear his understanding was based entirely on his interaction with outside counsel.

> Question:    Is it your understanding that Smith & Wesson's sales were down
> significantly in April 2007?

| | |
|---|---|
| Answer: | Yes.  Yes, it's my understanding.  Yes. |
| Question: | Based on your consultation with your attorneys? |
| Answer: | Yes. |
| | *          *          *          * |
| Question: | Do you agree with that statement? [referring to Paragraph 11 of the Complaint]. |
| Answer: | That's my understanding of the facts. |
| Question: | Okay.  And where did you gain that understanding of the facts? |
| Answer: | Talking to my securities litigation attorneys. |
| Question: | Anywhere else? |
| Answer: | Probably not. |

Jones Dep., pp. 154 [lines 20-25], 162 [lines 10-18].  Similarly, when asked to elaborate about the Complaint's reference to quotes from the September 6, 2007 conference call with financial analysts concerning the Company's financial results for the first quarter of fiscal year 2008 [Paragraph 115], and to identify the alleged "misstatements," Mr. Jones replied: "As far as I'm concerned this is demonstrating misstatements prepared by, you know, our securities litigation firm, it speaks for itself."  *See* Jones Dep., p. 187 [lines 4-6].  Similarly, when asked about additional language from the September 6, 2007 conference call [Paragraph 116] and whether he considered such language to be a misstatement, Mr. Jones "I'm not really sure," "It is what it is," and "I have no idea.  I think – I'm trying to read it from the point of view of – I mean, these are issues prepared by our securities litigation counsel."  Id., at p. 188 [lines 14-16].  When pushed on his analysis (or lack thereof) Mr. Jones again simply pointed to the Complaint.

| | |
|---|---|
| Question: | Okay. I mean, is it then your testimony that if your securities litigation counsel says something's a misstatement you would agree and consider that a misstatement, where if they said something wasn't a misstatement you would similarly agree that [it was not] a misstatement? |
| Answer: | I don't think life's that simple. I think it's going to be, the Complaint's the Complaint prepared by our securities litigation firm. |
| Question: | And you're relying -- |
| Answer: | I haven't reviewed it, I think the overall picture that they paint on this case is accurate. |
| Question: | Okay. But you're relying on -- |
| Answer: | I would say that's accurate. |
| Question: | -- on your securities litigation counsel as to the accuracy of the facts contained in the Complaint; correct? |
| Answer: | Yes. |

\*　　　　　\*　　　　　\*　　　　　\*

| | |
|---|---|
| Question: | Is [your understanding of the allegations in the Complaint] based on any independent investigation by -- the Oklahoma Fund? |
| Answer: | No. |
| Question: | Any reading of Smith & Wesson's financial filings, except as contained in the Complaint? |
| Answer: | No. |

*See* Jones Dep., pp. 188 [lines 21-25]; 189 [lines 1-13], 190 [lines 13-20].

Amazingly, Mr. Jones was not even aware that SWHC's fiscal year did not conform to the end of the calendar year until he read of it during his deposition. *See* Jones Dep., pp. 173 [lines 23-25], 174 [line 1], 176 [lines 9-11]. Mr. Jones' lack of knowledge does not end there. When asked if he read this Court's March 26, 2009

Order and its opinion on what statements are actionable in this matter, Mr. Jones

responded: "I'm not familiar with it" and "[I] don't know if I've seen it or not.  I'm

stating I'm not familiar with it."  *See* Jones Dep., p. 211 [lines 1-13].[14]

Finally, in other instances, Plaintiff simply refused to answer the question posed

to him as it pertained to what Plaintiff alleges to be "corrective" disclosures of past or

historical fact.  For example, when asked about the allegations in the Complaint under the

heading "The Truth Emerges" (Complaint, ¶¶ 123-126), and whether he had any reason

to believe the statements contained in the Company's October 29, 2007 and December 6,

2007 press releases were false, Mr. Jones responded "I don't really care.  I consider these

are statements from liars and I really don't care."  *See* Jones Dep., p. 209 [lines 14-17].

When asked again if he had any reason to consider the statements contained in the press

releases to be false, Mr. Jones again responded "I don't care" and that "I'm not going any

farther than that."  Id.[lines 18-22].

### C.    Plaintiff's Understanding of this Litigation Conflicts with the Allegations Set Forth in the Complaint

The Complaint alleges that Defendants fraudulently misrepresented "demand" for

Smith & Wesson products (and until this Court's March 26, 2009 Order, that certain

forward-looking statements were false).  Plaintiff does not share that view.  Even though

the Complaint, notably, does not contain any allegations that the actual sales data

reported in the Company's quarterly and annual public filings were inaccurate or in any

way false or misleading, when asked to reconcile the Complaint's allegations that

"demand" for Smith & Wesson products was rapidly declining in the face of double-digit

---

[14]  While Mr. Jones did recall Defendant Barry Monheit's dismissal from this action, he acknowledged that his only understanding of the Order was from discussions with outside counsel and did not recall reading it. *See* Jones Dep., 213 [lines 1-21].

increases in growth the first and second quarters of Fiscal Year 2008, Mr. Jones

repeatedly questions either (1) the veracity of the Complaint, or (2) the accuracy of the

financial data contained SWHC's quarterly and annual public filings.

| | |
|---|---|
| Question: | Now, is it your contention in that Complaint that any of these disclosures of order backlog was in any way inaccurate? |
| Answer: | Well, I'm having a problem with reconciling with my understanding of inventory backing up, like I understand it was, and the accuracy of these back order statements in the 10-Q. |
| Question: | And what do you mean by that? |
| Answer: | I can't tell you whether it's right or wrong but I find it questionable. |
| Question: | These statements in the [Form] 10-Q? |
| Answer: | Yes. |
| Question: | Based on what you know of the Complaint? |
| Answer: | Correct. |

*            *            *            *

| | |
|---|---|
| Question: | Well, your prior testimony was that sales were declining and yet revenue here is increasing 56.3% |
| Answer: | I thought it was stating that orders were declining. |
| Question: | Okay. And so that would manifest itself later, is that your contention? |
| Answer: | Well, this is where I said earlier when I was looking at the 10-Q, I was having problems reconciling the financials with what I understood was happening internally at the company. |

*            *            *            *

| | |
|---|---|
| Question: | Okay. And that's why you say when you have questions with it, you have questions as to whether this is actually an accurate indication of sales? |

-22-

|           |        |
|-----------|--------|
| Answer:   | Right. |

*See* Jones Dep., pp. 147 [lines 23-25], 148 [lines 2-12], 182 [line 25], 183 [lines 1-23].

When asked about additional statements in the September 6, 2007 press release regarding

the results for the first quarter of Fiscal 2008, Mr. Jones responded in similar fashion:

| | |
|-----------|---|
| Question: | So, as a result you find these statements to be inaccurate? |
| Answer:   | Again, I cannot reconcile them with the internal reports. |
| Question: | Okay.  And it's not just the statements, also it's the numbers that you're seeing reported here? |
| Answer:   | Uh-huh. |
| Question: | Sales that are reported here? |
| Answer:   | I just can't reconcile.  There's a disconnect in my mind between the financial statements being reported and the internal flow of information within the company. |

*See* Jones Dep., p. 185 [lines 2-14].

This type of inconsistent testimony creates serious problems with respect to

Plaintiff's typicality and adequacy as representative of the class, all to the detriment of

the putative class.  *See e.g.* Darvin v. International Harvester Co., 610 F. Supp. 255, 257

(S.D.N.Y. 1985) (credibility problems as demonstrated from deposition testimony render

plaintiff inappropriate class representative); Cohen v. Laiti, 98 F.R.D. 581, 584

(E.D.N.Y. 1983) (class certification denied based on plaintiff's deposition testimony

rendering him subject to attack).

> **D.    Plaintiff's Post-Class Period Stock Purchases**
> **Preclude It From Serving As Class Representative**

Plaintiff's post-class period stock purchases are a unique defense that renders it

atypical and precludes it from serving as class representative.  *See e.g.* In re Cardinal

Health Sec. Litig., 226 F.R.D. 298, 310 (S.D.Ohio 2005) (noting that the timing of lead

plaintiff's purchases -- after disclosure of the alleged fraud -- renders the presumption of typicality and adequacy rebutted); In re Safeguard Scientifics, 216 F.R.D. 577, 582-83 (E.D.PA 2003) (precluding lead plaintiff from serving as class representative where he "increased his holdings in [the company] stock even after public disclosure of the alleged fraud.").

While Plaintiff alleges that the operative end date for the putative Class Period is December 6, 2007 -- when the Company issued a press release posting second quarter net sales and profits -- the evidence undeniably shows that the very same information had already been publicly disclosed in the Company's October 29, 2007 press release announcing its preliminary second quarter results.[15]  *See* Complaint ¶ 125.  Aside from forward-looking statements (which are not actionable), the December 6, 2007 press release does not deviate or provide any new information that was not already disclosed in the October 29, 2007 press release, nor does it identify any restatement, change or correction as to any statements of present or historical fact.  Accordingly, any purchases of SWHC stock after October 29, 2007 lacks any credible allegation of reliance -- presumed or otherwise.[16]

Plaintiff's purchases of SWHC stock suffer from these same questions of reliance. Tellingly, Plaintiff's trading records indicate that on October 30, 2007, the very next day

---

[15]  A true and accurate copy of the SWHC Press Releases for October 29, 2007 and December 7, 2007 are attached to the Sten Decl., as Exhibits D and E respectively.

[16]  For the same reasons, even if a class were to be certified in this matter (which it should not) such a class cannot extend beyond October 29, 2007, as that date is when the first "corrective disclosure" by SWHC is alleged to occur.  *See* Complaint at ¶ 10.  Plaintiff tries to overcome this limitation by claiming October 29, 2007 constituted only a "partial disclosure" of the truth.  *See*  Complaint at ¶ 11.  As discussed above, the only new material in the December 6, 2007 press release was forward-looking in nature.  Accordingly, to the extent there was a corrective disclosure by SWHC (which there were not), it occurred on October 29, 2007.

following the Company's press release -- where the alleged "truth" was revealed to the market [Complaint, ¶ 123], Plaintiff's independent money manager proceeded to purchase 16,600 shares of SWHC common stock at a price of $12.28 per share. A true and accurate copy of Plaintiff's purchases of SWHC stock during the putative class period is attached to the Sten Decl. as Exhibit F.[17] Moreover, the very next day, on October 31, 2007, Plaintiff purchased an additional 17,800 shares of SWHC common stock at $12.31 per share. This purchase of more than 34,000 shares of SWHC common stock following disclosure of the alleged "truth" to the market, indicate that Plaintiff made investment decisions with respect to the Company's stock based on its own evaluation of the Company -- not the market's assessment. *See e.g.* Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (doubting plaintiff's post-class purchases were "based upon the stock market" where he increased his stock holdings after revelation of an alleged fraud). Such conduct renders Plaintiff atypical and inadequate to serve as class representative.[18] Id.

## III.    CERTIFICATION OF THE PUTATIVE CLASS IS INAPPROPRIATE BECAUSE INDIVIDUAL ISSUES OF FACT AND LAW PREDOMINATE OVER COMMON ISSUES

Plaintiff's bare assertion that "it is clear common questions of law predominate over individual issues" [Pl. Memo., p. 14], with no factual or evidentiary support, does not satisfy Rule 23(b)(3)'s "predominance" requirement. The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant

---

[17] This chart is an attachment to an exhibit to Plaintiff's Declaration re: Motion for Appointment as Lead Plaintiff [Docket No. 21].

[18] This trading activity only strengthens Defendants' argument that the fraud-on-the-market presumption is inapplicable here, as Plaintiff's trading activity indicates that Plaintiff did not rely on the "integrity of the market" and would have purchased SWHC stock regardless of the alleged misstatements. As such, reliance cannot be presumed.

adjudication by representation." *See* <u>New Eng. Carpenters Health Bens. Fund v. First</u>

<u>Databank, Inc</u>., 244 F.R.D. at 83-84 (quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S.

at 623).[19]  This requirement is not met where the resolution of a plaintiff's claims would

require individualized inquiries.  *See* <u>In re Credit Suisse-AOL Sec. Litig.</u>, 253 F.R.D. at

25 (internal quotation omitted).

> **A.     The Fraud-On-The-Market Presumption Is Inapplicable**
> **Here Because Plaintiff Cannot Establish Loss Causation**

In support of its Motion, Plaintiff presumes reliance under the so-called "fraud-

on-the-market  presumption" -- set forth in <u>Basic v. Levinson</u>, 485 U.S. at 248; Pl.

Memo. at 14-16.  This theory allows a plaintiff to escape showing the individual reliance

of each class member, so that the essential element of reliance can be litigated on a class-

wide basis.  However, this presumption is rebuttable and "<u>any</u> showing that severs the

link between the alleged misrepresentation and either the price received (or paid) by the

plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the

presumption of reliance." *See e.g.* <u>In re PolyMedica Corp. Securities Litig.</u>, 432 F.3d at 7

(quoting <u>Basic v. Levinson</u>, 485 U.S. at 248) (emphasis added); *see also* <u>In re Safeguard</u>

<u>Scientifics</u>, 216 F.R.D. at 582-83 (rebutting the fraud-on-the-market presumption at the

class certification stage by demonstrating that the lead plaintiff "increased his holdings in

[the subject] stock even after public disclosure of the alleged fraud.").

The fraud-on-the-market presumption is rebutted because Plaintiff cannot

establish loss causation.  *See* <u>In re Boston Scientific Corp. Sec. Litig.</u>, 604 F. Supp.2d at

---

[19]  Fed. R. Civ. P. 23(b)(3) requires that common questions of fact and law predominate over any questions
that must be resolved individually as to each class member.  *See* Fed. R. Civ. P. 23(b)(3); *see also* <u>Amchem</u>
<u>Prods., Inc. v. Windsor</u>, 521 U.S. at 623-24; <u>In Re Boston Scientific Corp. Securities Litig.</u>, 604 F. Supp.2d
at 280.

286 (requiring a plaintiff seeking class certification to present sufficient "basic facts" to determine the applicability of the fraud-on-the market presumption); *see also* Oscar Private Equity Invs., 487 F.3d at 265 (requiring plaintiff to establish loss causation in order to trigger the fraud-on-the-market presumption). Absent that presumption, individual issues of reliance predominate over common issues at trial, effectively precluding certification of the proposed class. *See* Fed. R. Civ. P. 23(b)(3).

As the Supreme Court made clear in its decision in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), a securities fraud plaintiff must establish a direct causal connection between the alleged misrepresentation and the decline in the company's share price to establish "loss causation." *See* Dura Pharms., Inc., 544 U.S. at 336, 347 (requiring a plaintiff to establish the "causal connection" of the alleged economic loss and that "[a]n inflated purchase price will not by itself constitute or proximately cause the relevant economic loss needed to allege and prove 'loss causation.'"). This lack of causal connection severs the link between Plaintiff's alleged misrepresentation of demand and the subsequent decline in price of SWHC stock that occurred when SWHC provided updated guidance to the market (which was not a correction of any past statements) on October 29, 2007. Indeed, as the Dura Court recognized, while "an initially inflated purchase price *might* mean a later loss . . . that is far from inevitably so" and "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *See* Dura Pharms., Inc., 544 U.S. at 342-43.

1.    **This Court's March 26, 2009 Memorandum & Order significantly limits the scope of Plaintiff's claimed misrepresentations.**

Plaintiff's Motion fails to reference or in any way acknowledge this Court's March 26, 2009 Order,[20] which concluded that the Complaint's allegations were based almost entirely upon forward-looking statements[21] and that "[t]he statutory safe harbor provisions of the PSLRA immunized Defendants from liability for forward-looking statements because they included meaningful cautionary statements" rendering such statements "non-actionable." *See* Order at pp. 1-2, 19-20.  The Court further concluded that:

(1)    Smith & Wesson repeatedly warned investors that results might vary substantially from these projections;

(2)    the cautionary statements "fully satisfy the requirements of the PSLRA";

(3)    [t]he statements are extensive and cover the ground identified by Plaintiffs as relevant; and

(4)    they "warn, in clear language, that statements regarding expected projected profits and demand are merely predictions that are subject to risk."

Id. at pp. 19-20 (concluding "the cautionary statements prong of the safe harbor is itself sufficient to render Defendants' forward-looking statements non-actionable.").

The Court's Order eliminates the vast majority of alleged misstatements contained in the Complaint.  As this Court commented in its Order, "a very large number, probably the majority, of the statements Plaintiffs cite in the Complaint in support of their claims

---

[20]  *See* Sten Decl., Ex. A.

[21]  These "forward-looking statements" were identified as statements concerning "anticipated sales, income, income per share … capital expenditures .. for the fiscal year ending April 30, 2008 … the Company's strategies, the demand for the Company's products … ." *See* Order at p. 19 (referencing, *e.g.*, the Company's June 14, 2007 Press Release, Form 10-K dated July 16, 2007, and the September 6, 2007 Earnings Call).

are forward-looking and <u>not</u> <u>actionable</u>."  *See* Order at p. 30 (emphasis added).  The only

surviving allegations involve Defendants' purportedly intentionally false statements of

"present or historical fact."  <u>Id.</u> at p. 2.  This impacts the "rigorous analysis" this Court

must now conduct to make certain that Plaintiff has satisfied all of the prerequisites under

Fed. R. Civ. P. 23, and Plaintiff does not recognized that impact when moving for class

certification.

> **2.     Plaintiff fails to provide any evidence establishing loss causation.**

Plaintiff fails to present any evidence to show that it could prove loss causation on

a class-wide basis in the manner required by <u>Dura</u> and Fed. R. Civ. P. 23.  Indeed,

Plaintiff's Motion does little more than passively reference the allegations contained in

the Complaint and state, in conclusory fashion, that:

> (1)    facts common to all members of the Class will establish loss causation
>        because all of their losses resulted from the precipitous decline in the price
>        of S&W's stock immediately after the market learned the facts that
>        Defendants had intentionally concealed [Pl. Memo, p. 14];
>
> (2)    it "will be able to demonstrate" reliance in this matter through the fraud-
>        on-the-market presumption" [Pl. Memo., 14];
>
> (3)    it need only present "basic facts" that the fraud-on-the-market
>        presumption is applicable in this matter [Pl. Memo., 15]; and
>
> (4)    that it "not only can … show an empirical cause-and-effect relationship,
>        over time, between S&W's corporate statements and the Company's stock
>        price, [it] can [also] show that the Company's stock, in fact, rose in a
>        statistically significant manner after every allegedly false statement and
>        fell precipitously after each corrective disclosure."

<u>Id. at 16</u>.[22]

---

[22]  In support of this proposition, Plaintiff relies primarily upon the First Circuit decisions in <u>In re PolyMedica Corp. Securities Litig.</u>, 432 F.3d 1 (1st Cir. 2005), and <u>In re Xcelera.com Securities Litig.</u>, 430 F.3d 503 (1st Cir. 2005).  Each of these cases is readily distinguishable from the present matter, however, in that plaintiffs set forth evidence to establish loss causation and did not rely merely on the allegations asserted in the complaint.

The general allegations in the Complaint addressing "loss causation" [Complaint ¶¶ 146-153], similarly lack <u>any</u> specificity.  Those allegations simply state that Defendants' "false and misleading statements" were "material" and "artificially inflated S&W stock prices throughout the Class Period."  *See* Complaint at ¶¶ 146-147.  These allegations rely in large part on alleged misstatements regarding the Company's earnings expectations and fiscal outlook for 2008, which this Court has concluded are forward-looking and not actionable in this matter.

While Plaintiff admits that it needs to  present "basic facts" [Pl. Memo., p. 15] to invoke the fraud-on-the-market presumption, it has failed to do so.  Plaintiff has failed to identify any "corrective disclosures" that caused SWHC's stock price to decline.  *See e.g.* <u>Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton, Co.</u>, 2010 WL 481407, *3 (5th Cir. Feb. 12, 2010) (noting that "[a] subsequent disclosure that does not correct and reveal the truth of the previously misleading statement is insufficient to establish loss causation.").[23]  Under Fed. R. Civ. P. 23 and <u>Dura</u>, Plaintiff must show not only that the alleged misstatements caused stock price inflation, but also that revelations to the market that these statements were false caused a decline in price.  *See* <u>Dura Pharms., Inc.</u>, 544 U.S. at 342-43.  Plaintiff, however, refuses to point to a specific "revelation" or

---

[23]  While the First Circuit requires a plaintiff to present basic facts to establish the applicability of the fraud-on-the-market presumption, other Circuits have notably concluded that in order to qualify for class certification, plaintiffs alleging securities fraud claims are required to <u>prove</u>  that defendants' alleged misrepresentations were the proximate cause of plaintiffs' economic loss.  *See e.g.* <u>Oscar Private Equity Investments</u>, 487 F.3d at 267 (requiring "the court to find, not merely assume, the facts favoring class certification"); <u>Greenberg v. Crossroads Sys., Inc.</u>, 364 F.3d 657, 665 (5th Cir. 2004) (concluding that "to trigger the presumption of reliance, plaintiffs must demonstrate that … the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information."); <u>In re Pub. Offering Sec. Litig.</u>, 471 F.3d 24, 27 (2nd Cir. 2006) (noting "a district court must resolve factual disputes relevant to each Rule 23 requirement and find that whatever underlying facts are relevant to a particular Rule 23 requirement have been established.").  While this Circuit has described this approach as "around the more rigorous end of the spectrum," it does acknowledge that the plaintiffs must nevertheless provide "sufficient" facts to determine whether the fraud-on-the-market theory is "reasonably applicable."  *See* <u>In re Boston Scientific Corp. Sec. Litig.</u>, 604 F. Supp.2d at 286 (internal citation omitted).  Plaintiff has failed to present such "basic facts" here.

"corrective statement" contained in either SWHC's October 29, 2007 and December 6, 2007 press releases.  [Pl. Memo., p. 16].  It instead tries to hide behind vague allusions that the "truth" is in there.

### 3.    Plaintiff's claimed "truth" is nothing more than additional forward-looking statements that are not actionable.

Each of the press releases -- referenced in the Complaint under the Section "The Truth Emerges" [Complaint, ¶¶ 123-126] -- constitute nothing more than adjusted forward-looking guidance <u>as of those dates</u> and are not actionable.  *See e.g.* <u>Archdiocese of Milwaukee Supp. Fund</u>, 2010 WL 481407 at *5 (acknowledging (by analogy) that "merely lowering earnings estimates does not reveal that a defendant previously misrepresented those estimates").[24]  Put another way, the decline in Smith & Wesson's stock price was not caused by any "revelation" or a change or correction of any present or historical fact, but rather as a result of the adjusted forward-looking guidance.  *See* <u>Id.</u> Tellingly, Plaintiff has not identified a single fact to show otherwise, and the undisputed facts show that SWHC outperformed its stated expectations between June and September 2007.

Plaintiff's baseless contention that it "will establish loss causation because all of their losses resulted from the precipitous decline in the price of S&W's stock immediately after the market learned the facts that Defendants had intentionally concealed" [Pl. Memo., p. 14] is equally hollow.  Plaintiff fails to identify <u>any</u> "revelation" or previously undisclosed facts in either the above-referenced press releases, or the Company's quarterly and annual filings.  To the extent Plaintiff relies upon Company's "order backlog" in support of its allegations, such information was publicly

---

[24]  The <u>Archdiocese</u> Court further concluded that "[a] company is allowed to be proven wrong in its estimates" and that the press release "was not an actionable corrective disclosure."  <u>Id.</u>

disclosed in the Company's quarterly filing (Form 10-Q dated September 10, 2007), as well as its annual filing (Form 10-K dated July 16, 2007) -- a fact readily acknowledged by Plaintiff. *See* Complaint, at ¶ 42 ("…S&W publicly reported its order 'backlog' in quarterly and yearly financial statements, including the 2007 [Form] 10-K and the Q1 2008 [Form] 10-Q."). Significantly, Plaintiff does not allege that SWHC's revelation of order backlog constitutes a "corrective" disclosure or caused any loss.[25]

### B.    Plaintiff's Proposed Class Cannot Include Purchasers Who Sold SWHC Stock During the Class Period

Plaintiff's proposed class, as defined, fails to exclude SWHC purchasers who sold their SWHC holdings during the alleged class period. Plaintiff seeks certification of a class that includes "all persons who purchased S&W's common stock on the open market from June 14, 2007 through December 6, 2007." *See* Complaint at ¶ 156. But purchasers that sold their holdings of SWHC stock during the class period cannot establish loss causation under any circumstances because they both bought and sold at a purportedly inflated price. Accordingly, the proposed class is overbroad.

The Supreme Court's holding in Dura requires that loss causation be proven as to the putative class members--meaning that the putative class suffered "a relevant economic loss." Dura Pharms., Inc. 544 U.S. at 336, 347. In interpreting this requirement, lower courts have subsequently excluded selling individuals from the class, holding that "under Dura there can be no loss causation for plaintiffs who purchased and

---

[25] What is more, despite Plaintiff's bald assertions to the contrary, the Company's financial statements show Smith & Wesson experienced a significant increase in demand for its products when the alleged misrepresentations were purportedly made. Specifically, the Company experienced a 56% growth in sales for the first quarter of Fiscal 2008, with sales increasing from approximately $47.6 million in the first quarter of Fiscal 2007 to approximately $74.4 million in the first quarter of Fiscal 2008. *See* Sten Decl. at Exhibit G [June 30, 2008 Form 10-K, at F-48 to F-49]. Similarly, the second quarter also realized a significant growth in sales of 39%, with sales increasing from approximately $50.7 million in the second quarter of Fiscal 2007 to approximately $70.7 million in the second quarter of Fiscal 2008. Id.

sold stock at the inflated share price prior to [the alleged] disclosure, and thus these plaintiffs may not recover at all." In re Cornerstone Propane Partners, L.P. Securities Litigation, 2006 WL 1180267, *8 (N.D. Cal. May 3, 2006).   Therefore, even if a putative class were to be certified with Plaintiff as its representative (which it should not for all the reasons stated above), those persons who sold their SWHC stock holdings before the end of the class period should be excluded.  Id. (excluding plaintiffs who sold shares during the relevant class period).

## CONCLUSION

For foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification.

Dated:  March 8, 2010

Smith & Wesson Holding Corp.,

By its attorneys,

/s/  John A. Sten
John A. Sten (BBO #629577)
Jason C. Moreau (BBO #648678)
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110
Telephone:  (617) 310-6025
Facsimile:  (617) 279-8425
stenj@gtlaw.com
moreauj@gtlaw.com

Francis D. Dibble, Jr. (BBO #123220)         E. Jeffrey Walsh (*Pro Hac Vice*)
BULKLEY, RICHARDSON &                         Brian J. Schulman (*Pro Hac Vice*)
GELINAS, LLP                                  GREENBERG TRAURIG, LLP
1500 Main Street, Suite 2700                  2375 E. Camelback Road, Suite 700
Springfield, Massachusetts 01115-5507         Phoenix, Arizona 85016
Telephone:  (413) 272-6246                    Telephone:  (602) 445-8000
Facsimile:  (413) 272-6804                    Facsimile:  (602) 445-8100
fdibble@bulkley.com                           walshj@gtlaw.com
                                              schulmanb@gtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

       I, John A. Sten, certify that on March 8, 2010, the following document was filed electronically with the Court.  Notice will be sent by e-mail to all parties through the Court's electronic filing system and the filing may be accessed through the Court's system.

                               /s/  John A. Sten            
                               John A. Sten