# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                   )
IN RE SMITH & WESSON               )
HOLDING CORP. SEC. LITIG.,         )          C.A. No. 07-30238
_____  )

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**BERMAN DEVALERIO**

Glen DeValerio, BBO#122010
Bryan A. Wood, BBO# 648414
Jason M. Leviton, admitted _Pro Hac Vice_
One Liberty Square
Boston, Massachusetts 02109
Tel.: 617-542-8300
Fax: 617-542-1194
Email: _bwood@bermanesq.com_

**Lead Counsel for Lead Plaintiff
Oklahoma Firefighters Pension and
Retirement System**

Dated:  April 5, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

PRELIMINARY STATEMENT ....................................................1

ARGUMENT..................................................................................3

I.   PLAINTIFF WILL FAIRLY AND
     ADEQUATELY REPRESENT THE
     INTERESTS OF THE PROPOSED CLASS ...........................3

     A.   Defendants' "Due Process" Arguments
          Should Be Afforded Little Weight....................................4

     B.   Plaintiff's Relationships with Securities
          Litigation Firms, Involvement in Prior
          Securities Litigation, and Employment
          of Outside General Counsel, in No Way
          Renders the Fund Inadequate to Serve
          as Class Representative ....................................................4

          1.   The Fund's Involvement Here Came
               About Not Through Solicitation but
               Rather from the Fund's Advance
               Decision to Hire Law Firms to
               Monitor Its Investments and Identify
               Related Securities Cases .............................................5

          2.   There was No Guarantee that the
               Fund Would Hire Any of Its Portfolio
               Monitoring Counsel to Lead this
               Securities Litigation .....................................................7

          3.   The Fund's Use of an "Outside" General
               Counsel is a Non-Issue with Respect to
               Its Adequacy to Serve as Class
               Representative ................................................................9

     C.   Plaintiff has Played an Active Role in this
          Litigation and has Exercised Significant
          Oversight over Its Securities Litigation
          Counsel..............................................................................9

D.    **Armed with a Thorough Understanding of the Case and Knowledge of the Facts, the Fund is Well Qualified to Manage this Litigation**.................11

    1.  *Plaintiff Understands Its Role as Class Representative* ....................12

    2.  *Plaintiff has a Thorough Understanding of the Case* .................13

II.    **CERTIFICATION OF THE CLASS IS APPROPRIATE BECAUSE COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES** .................17

    A.    **Despite Defendants' Effort to Foster Mini-Trials, a Merits Inquiry is Only Appropriate Where the Merits Overlap with Rule 23 Criteria** .......................18

    B.    **Given that Plaintiff has Proffered Basic Facts Showing that the Fraud-on-the-Market Presumption Applies Here, Common Questions of Reliance Predominate**...................19

        1.  *Plaintiff has Demonstrated that the Market for S&W's Stock was Efficient During the Class Period*...........19

           a.  **S&W's Stock was Actively Traded** ...................20

           b.  **Information on S&W's Stock was Widely Available**..........................21

           c.  **S&W's Stock Traded on the NASDAQ and had Numerous Market Makers**...................22

           d.  **S&W Filed Form S-3 Registration Statement** .............................22

           e.  **There is a Cause and Effect Relationship Between S&W's Stock Price and Unexpected Corporate Events**.................................23

    2. *Defendants Cannot Rebut the*
     *"Fraud-on-the-Market" Presumption of*
     *Reliance at the Class Certification Stage* ...................**24**

   C. **Common Questions Definitely Predominate**
    **over Individual Questions Related to**
    **Loss Causation** ...............................................................**28**

    1. *There are No Individual Questions*
     *of Loss Causation* ........................................................**28**

    2. *Plaintiff has Adduced Basic Facts*
     *Demonstrating Its Ability to Prove*
     *Loss Causation at Trial* ..............................................**28**

 III. **PLAINTIFF'S CLAIMS ARE TYPICAL OF**
   **CLASS MEMBERS' CLAIMS** ..............................................**20**

**CONCLUSION** ..............................................................................................**31**

## TABLE OF AUTHORITIES

**Cases**

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
 No. 08-11195,
 2010 U.S. App. LEXIS 3226,
 (5th Cir. Feb. 12, 2010) .................................................................................................27

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
 222 F.3d 52 (2d Cir. 2000) ............................................................................................12

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989).................................................................................20

*Cohen v. Laiti*,
 98 F.R.D. 581 (E.D.N.Y. 1983) ...................................................................................16

*Darquea v. Jarden Corp.*,
 No. 06 Civ. 722,
 2008 U.S. Dist. LEXIS 17747,
 (S.D.N.Y. Mar. 6, 2008) ...............................................................................................26

*Darvin v. International Harvester Co.*,
 610 F. Supp. 255 (S.D.N.Y. 1985)...............................................................................16

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005) ................................................................................................25, 29

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*,
 657 F.2d 890 (7th Cir. 1981) .........................................................................................4

*Feder v. Elec. Data Sys. Corp.*,
 429 F.3d 125 (5th Cir. Tex. 2005) ...............................................................................30

*Fletcher v. Atex, Inc.*,
 68 F.3d 1451 (2d Cir. 1995) ...........................................................................................1

*Griffin v. GK Intelligent Sys., Inc.*,
 196 F.R.D. 298 (S.D. Tex. 2000) ...................................................................................7

*Guckenberger v. Boston Univ.*,
 957 F. Supp. 306 (D. Mass. 1997) ...............................................................................29

*In re Boston Scientific Corp. Sec. Litig.*,
  604 F. Supp. 2d 275 (D. Mass. 2009) ................................................passim

*In re Credit Suisse AOL Sec. Litig.*,
  253 F.R.D. 17 (D.Mass 2008) ..........................................................passim

*In re El Paso Sec. Litig.*,
  No. EP-03-CA-0004-DB (S.D. Tex.) ......................................................5

*In re First Marblehead Corp. Sec. Litig.*,
  639 F. Supp. 2d 145 (D. Mass. 2009) ...................................................27

*In re GE Sec. Litig.*,
  No. 09 Civ. 1951(DC),
  2009 U.S. Dist. LEXIS 69133,
  (S.D.N.Y. July 29, 2009) ......................................................................9

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009) .........................................................26

*In re ICG Comm'ns, Inc. Sec. Litig.*,
  Civil Case No. 00-RB-1864,
  2006 U.S. Dist. LEXIS 6695,
  (D. Colo. Feb. 7, 2006) .......................................................................29

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009) .........................................................26

*In re Lupron Marketing and Sales Practices Litig.*,
  228 F.R.D. 75
  (D. Mass. 2005) ..................................................................................11

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) ..........................................................26

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132  (S.D.N.Y. 2008) ........................................................11

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ...................................................................18

*In re NTL Sec. Litig.*,
  No. 02 Civ. 3013,
  2006 U.S. Dist. LEXIS 5346,
  (S.D.N.Y. Feb. 14, 2006) ....................................................................11

*In re Organogenesis Sec. Litig.,*
   241 F.R.D. 397 (D. Mass. 2007).................................................................12

*In re PolyMedica Corp. Sec. Litig.,*
   432 F.3d 1 (1st Cir. 2005)........................................................................19

*In re Sepracor Inc.,*
   233 F.R.D. 52 (D. Mass. 2005)................................................................30

*In re Transkaryotic Therapies, Inc. Sec. Litig.,*
   No. 03-10165-RWZ,
   2005 U.S. Dist. LEXIS 29656,
   (D. Mass. Nov. 28, 2005)....................................................................3, 11

*In re Wellbutrin SR Direct Purchaser Litig,.*
   No. 04-5525,
   2008 U.S. Dist. LEXIS 36719,
   (E.D. Pa. May 2, 2008)..............................................................................4

*In re Xcelera.com Sec. Litig.,*
   430 F.3d 503, (1st Cir. 2005)...................................................................20

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and*
   *Securitization, LLC,*
   616 F. Supp. 2d 461 (S.D.N.Y. 2009).....................................................7, 8

*Jandak v. Brookfield,*
   520 F. Supp. 815 (N.D. Ill. 1981) .............................................................1

*Kinney v. Metro Global Media, Inc.,*
   No. 99-579 ML,
   2002 U.S. Dist. LEXIS 18628,
   (D.R.I. Aug. 22, 2002).............................................................................12

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
   487 F.3d (5th Cir. 2007)..........................................................................26

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.,*
   136 F.R.D. 658 (D. Or. 1991)...............................................................7, 11

*Rosen v. Textron, Inc.,*
   369 F. Supp. 2d 204 (D.R.I. 2005)..........................................................12

*Silverman v. Motorola, Inc.,*
   259 F.R.D. 163, (N.D. Ill. 2009)................................................................9

*Surowitz v. Hilton Hotels Corp.,*
   383 U.S. 363 (1966) ...............................................................................................12

*Wagner v. Barrick Gold Corp.,*
   251 F.R.D. 112 (S.D.N.Y. 2008) ...........................................................................11

*Yang v. Odom,*
   No. 02-5968,
   2005 U.S. Dist. LEXIS 18089,
   (D.N.J. Aug. 16, 2005) ...........................................................................................30

## Rules

Fed. R. Civ. P. 23(a)..................................................................................................1
Fed. R. Civ. P. 23(b)..................................................................................................1
Fed. R. Civ. P. 23(b)(3).............................................................................................17

Lead Plaintiff, Oklahoma Firefighters Pension and Retirement System ("Plaintiff," "Oklahoma Firefighters," or "the Fund"), hereby submits this reply memorandum in further support of Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pls.' Mem.").

## PRELIMINARY STATEMENT[1]

Not content to argue their cause on the merits, Defendants employ "that old, but not venerable, lawyer's adage" that when the law and the facts are against you, "attack your opponent." *Jandak v. Brookfield,* 520 F. Supp. 815, 819 n.2 (N.D. Ill. 1981). Indeed, lacking any substantive rebuttal to Plaintiff's motion, Defendants' opposition contains page after page of selective quotes from the deposition testimony of Plaintiff's Executive Director and designated representative, Robert E. Jones, Jr. ("Jones"), multiple distortions of the record – some outlandish and all to suit their own purposes – and numerous mischaracterizations of the governing law. This Court should not reward their desperate, yet entirely groundless, attempt to avoid class certification.

Contrary to Defendants' contention that Plaintiff relies on "conclusory, self-serving allegations that are not evidence and that cannot support class certification," Defs.' Mem. at 1, 8, substantial evidence supports Plaintiff's motion.[2] Among that evidence is Jones's deposition testimony – read in context – and the exhibits entered at his deposition; pertinent facts of which this Court may take judicial notice; the

---

[1] In opposing class certification, Defendants have limited their arguments to the adequacy and typicality prongs of Fed. R. Civ. P. 23(a), and the predominance prong of Fed. R. Civ. P. 23(b), as it pertains to the reliance and loss causation elements of Plaintiff's claims.

[2] In arguing that Plaintiff cannot present "mere conclusory allegations . . [, which] are not evidence . . . ," Defendants quote from *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995). *See* Defs.' Mem. at 9. Defendants, however, somehow ignore the crucial fact that the Court in *Fletcher* was deciding a motion for ***summary judgment*** rather than a motion for class certification – the proceeding involved here – which entails a vastly different standard of proof. *Id.*

Declaration of Plaintiff's Counsel and the exhibits attached thereto; and an expert declaration prepared by economist Candace L. Preston, which is submitted herewith.

Regarding Defendants' challenge to Rule 23's adequacy requirement, this Court need only review that evidence, particularly Jones's deposition testimony and the accompanying exhibits, to see that the Fund is not only an "adequate" class representative, but, in fact, is well qualified to represent the class. Jones's testimony demonstrates unambiguously that the Fund has a thorough understanding of Plaintiff's duties to the Class, understands the underlying case, has actively overseen this litigation, has retained qualified and experienced counsel to represent the class – a point that Defendants do not dispute – and has no conflicts with other class members.

Defendants' rebuttal arguments are patently without merit and, indeed, smack of their desperation. Lead Counsel did not solicit Plaintiff to participate in this case, as Defendants nakedly claim. Nor was there any *quid pro quo* between Plaintiff and Lead Counsel in connection with this (or any other) case. Furthermore, Plaintiff was not personally required, as Defendants contend, to investigate this case or draft the Complaint, but rather it had the right to rely on counsel to perform those tasks. Plaintiff's job was, and is, to adequately oversee the prosecution of this litigation as a fiduciary for the Class – a task the evidence reveals them to have undertaken with vigor.

Moreover, Plaintiff has overwhelmingly demonstrated that common questions predominate over individual issues of reliance and loss causation. All Defendants have done to rebut that showing is to manufacture confusing arguments that individual questions of reliance and loss causation predominate because Plaintiff cannot **prove** loss causation. There is so much wrong with Defendants' arguments, however, it is difficult

to summarize it all concisely here.  Suffice it to say, the arguments: (1) are based on case law that has been firmly rejected by this and virtually all other courts; (2) improperly conflate the reliance and loss causation elements of Plaintiff's claims; (3) jumble the mutually exclusive concepts of "forward-looking" false statements and truthful corrective disclosures; and (4) blatantly ignore binding First Circuit precedent concerning:  (a) the general class certification standard of proof; (b) the application of the Rule 23 predominance prong to loss causation questions; and (c) the requisite showing necessary to demonstrate the "fraud-on-the-market" theory of reliance.[3]

Accordingly, there is no question that this action is well-suited for class certification and that Plaintiff is highly qualified to serve as a class representative.

## ARGUMENT

### I.    PLAINTIFF WILL FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF THE PROPOSED CLASS

To demonstrate "adequacy" under Rule 23(a)(4), "lead plaintiffs must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *In re Transkaryotic Therapies, Inc. Sec. Litig.*, No. 03-10165-RWZ, 2005 U.S. Dist. LEXIS 29656, at *14 (D. Mass. Nov. 28, 2005) (internal citation omitted). As in *Transkaryotic*, "[n]o dispute has been raised about the competency of lead plaintiffs' counsel"; rather, Defendants "assail[] [Plaintiff's] alleged lack of control" over the litigation and "general lack of understanding regarding the claims." *Id.* at *14-15.  As discussed herein, however, those assertions find

---

[3] Defendants only argument that Plaintiff does not meet Rule 23's "typicality" requirement has no merit either, as its entire foundation hinges on a faulty premise that Defendants invented to support their misguided predominance arguments and, therefore, it should be soundly rejected as well.

absolutely no support in the record. To the contrary, the so-called "evidence" in support

of Defendants' specious claims ranges from testimony taken wildly out of context to

outright distortions of the factual record. Accordingly, this Court should conclude that

Plaintiff has met its burden of demonstrating its adequacy to serve as a class

representative in this case.

**A.      Defendants' "Due Process" Arguments Should Be Afforded Little Weight**

In challenging Plaintiff's adequacy, Defendants invoke the "due process" rights of

absent class members. *See* Defs.' Mem. at 10 n.8. "[C]ourts are generally skeptical of"

such arguments though, because they are made "in the guise of ensuring adequate

representation for the class, where in reality, the defendant seeks to avoid class

certification altogether." *In re Wellbutrin SR Direct Purchaser Litig.,* No. 04-5525, 2008

U.S. Dist. LEXIS 36719, at *21-23 n.14 (E.D. Pa. May 2, 2008). Indeed, affording any

weight to Defendants' concerns for the well-being of the class "is a bit like permitting a

fox, although with a pious countenance, to take charge of the chicken house." *Eggleston

v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir.

1981). Thus, this Court should consider Defendants' professed concern for the

"adequacy" of the class's representation with a healthy dose of skepticism.

**B.      Plaintiff's Relationships with Securities Litigation Firms, Involvement in
          Prior Securities Litigation, and Employment of Outside General Counsel, in
          No Way Renders the Fund Inadequate to Serve as Class Representative**

Defendants claim that the Fund is inadequate because it "has a longstanding

pattern of lending its name to outside counsel and giving them full discretion to manage

its litigation." Defs.' Mem. at 11; *see also id.* (arguing that Plaintiff is "nothing more

than a pawn for two outside law firms."). According to Defendants, that claimed

infirmity results in the kind of "lawyer-driven litigation that the PSLRA was enacted to

4

control." *See id.* at 13. Defendants' bogus argument relies primarily on the following purported facts: (1) that the Fund supposedly became involved in the case through solicitation; (2) that the Fund employs numerous securities litigation firms; (3) that the Fund has been involved in various securities fraud cases, with Lead Counsel serving as attorneys for the Fund in one such case; and (4) that the Fund employs outside attorney Marc Edwards ("Edwards") as its General Counsel. *See* Defs.' Mem. at 12-14. Not only are these supposed "facts" no impediment to Plaintiff's motion to serve as class representative, some are not even facts at all, but rather blatant distortions of the record. [4]

### 1. The Fund's Involvement Here Came About Not Through Solicitation but Rather from the Fund's _Advance_ Decision to Hire Law Firms to Monitor Its Investments and Identify Related Securities Cases

Defendants' argument as to the manner in which the Fund became involved in this case is plainly irresponsible. Defendants provocatively assert that "[i]t was outside counsel for the Plaintiff (Berman DeValerio), who contacted Plaintiff and encouraged it to pursue lead plaintiff status – not the other way around." Defs.' Mem. at 12. The true facts, however, paint a markedly different picture. Jones's testimony specifically demonstrates that, *prior to this litigation*, the Fund's Board of Directors ("Board") maintained a roster of securities litigation firms, including Lead Counsel, to monitor its nearly two billion dollar portfolio and to keep the Board appraised of potential litigation

---

[4] Moreover, one of Defendants' "facts" is nothing short of laughable and can be dispensed with summarily. In an ironic twist, they argue that Plaintiff's "extensive experience in prior securities litigation" makes Plaintiff *unsuitable* to serve as a class representative. *Id.* at 14 (emphasis added). The Fund's record, however, of successfully prosecuting securities cases (including *In re El Paso Sec. Litig.*, No. EP-03-CA-0004-DB (S.D. Tex.), which settled for $285 million) has resulted in substantial recoveries and establishes that Plaintiff's prior experience in securities litigation is an *asset* rather than a liability to the Class – something that Defendants' own cases appear to recognize. *See Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (holding that whereas one applicant for lead plaintiff had "little real expertise in handling such cases, the accumulated experience of [the pension fund plaintiff] in pursuing multiple securities fraud actions *seems a benefit more than a detriment*. Moreover, ... the provision of the PSLRA restricting the use of professional plaintiffs was largely directed at private individuals, and courts have routinely waived the restriction in the case of qualified institutional investors.") (emphasis added).

involving those holdings.  *See* Transcript of Robert E. Jones Deposition ("Depo. Tr."), at

28:19-29:1.  Jones further explained how and why the Board used securities counsel:

> A.    Basically securities litigation firms are brought to the attention of the Board
> by the general counsel, [Marc] Edwards of this firm here, Phillips Murrah. . . .
> One of the key things to understand is that when the Board makes a relationship
> with the securities litigation firm, it is only to the extent that we allow them to
> review our transactions.  There is no commitment that they will represent us in a
> securities action.  In fact, some of the firms that we've had they've been on our
> list and been reviewing our transactions for years and have never brought a case
> to us.  *The Board's attitude towards allowing firms to have access to their*
> *records is rather generous.  Where they get really serious is when an actual*
> *case is brought to them and then they decide whether they want to proceed or*
> *not.  So it's kind of – my point is, it's a two step, it's a two step process.  We*
> *have lots of people.  <u>The board seems to like a lot of people looking at our</u>*
> *<u>transactions to insure [(sic)] that we're not being mistreated.</u>*

Depo. Tr., at 29:8-30:6 (emphasis added).

Defendants' argument flies in the face of Jones's testimony, recklessly implying

that Lead Counsel engaged in improper solicitation and ignoring the fact that Berman

DeValerio is but one of many firms monitoring the Fund's investments, each of which is

*required* by the Fund's own written investment policy to bring related litigation to the

Board's attention.  *Id.* at 76:11-14 (referring to the Fund's "Securities Litigation Policy");

*see also* Exhibit A to the Third Amendment To Investment Manager Agreement Between

Board of Trustees Of The Oklahoma Firefighters Pension And Retirement System And

Waddell & Reed Investment Management Company dated effective as of June 15, 2007

("Investment Policy"), Depo. Tr., Ex. 7, at 5, 37 (requiring securities counsel:  (1) to

"review potential and filed class action lawsuits" and bring them to attention of Fund's

investment committee; and (2) to make recommendations to Fund as to whether:  (a) to

monitor the case; (b) to seek lead plaintiff status; and/or (c) to take some other action),

attached as Exhibit 1 to the Declaration of Jason M. Leviton filed herewith.[5]

Accordingly, this Court should give no weight whatsoever to Defendants' spurious

claims concerning the Fund's entry into this case.

> **2.      *There was No Guarantee that the Fund Would Hire any of Its Portfolio Monitoring Counsel to Lead this Securities Litigation***

Defendants' argument that the Fund's relationship with its securities litigation

counsel creates an impermissible conflict of interest is equally meritless.  Specifically,

Defendants claim that "if the Fund decides to pursue [an] opportunity [to seek

appointment as lead plaintiff], ***it uses the presenting securities litigation firm as its***

***lawyers***," which Defendants further imply was done in this case.  Defs.' Mem. at 12

(emphasis added).  In making that argument, Defendants liken this matter to *Iron*

*Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization,*

*LLC,* 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009), a lead plaintiff case where the Court

disqualified a pension fund, in part, because it had entered into a contractual arrangement

with a securities litigation firm:

> whereby, in return for [the law firm's] providing free 'monitoring' of the Funds'
> [(sic)] investments, the Fund agreed that, if [the law firm] recommended bringing
> a securities class action and the Fund approved doing so, [the law firm] would be
> retained, on a contingent fee basis, to represent the Fund.

*Id.* at 464.  The Court concluded that such a "*quid pro quo*" arrangement fostered a

tendency toward "lawyer-driven litigation" by creating "a clear incentive for [the firm] to

---

[5] Needless to say, the purportedly analogous cases that Defendants cite where a firm with no prior
relationship with the class representative contacts the class representative and solicits its involvement in
litigation are completely inapposite.  For example, unlike Plaintiff here, in *Griffin v. GK Intelligent Sys.,*
*Inc.*, 196 F.R.D. 298 (S.D. Tex. 2000), the plaintiffs "were solicited for [their] lawsuit and have taken little
or no supervisory role over lead counsel.  They do not participate in litigation decisions, do not receive
regular cost/expense information, and they learn of activity in the case when they are copied on matters
already completed."  *Id.* at 302; *see also Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D.
658, 666 (D. Or. 1991) (rejecting class representative because he "is unfamiliar with the basic elements of
the case, including what the allegations of the complaint are," "did not become involved in the case until
after the basic groundwork had been laid," and "contributed nothing to the drafting of the complaint").

discover 'fraud' in the investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through him, to the trustees) that the Fund, at no cost to itself, bring a class action lawsuit." *Id.* at 463-64.

Yet, as the foregoing excerpt from Jones's deposition makes clear, the record in this case completely undermines Defendants' baseless assertion that a "*quid pro quo*" relationship exists between Lead Counsel and the Fund. Jones unambiguously testified that "[t]here is ___**no commitment**___ that [a securities litigation firm] will represent [the Fund] in a securities action" simply because it brought a case to the Board's attention. Depo. Tr., at 29:17-18 (emphasis added). Moreover, Jones testified that the "that right to review transaction[s] is ___**not**___ an entry, you know, a guarantee that you're going to be representing us." *Id.* at 30:8-10 (emphasis added). Thus, the main impediment identified in *Iron Workers* as limiting a party's ability to lead a securities fraud class action simply does not exist here.

In fact, a more searching evaluation of the facts in *Iron Workers* reveals that the case actually **supports** the Fund's motion. In *Iron Workers*, the court also rejected the conflicted pension fund because it was headed by a non-attorney administrator who "was not particularly sophisticated in evaluating securities class actions and, indeed, had only a rough idea of what this lawsuit was all about." 616 F. Supp. 2d 466. By contrast, the Fund's Executive Director, Jones, is both an attorney and an accountant (*see* Depo. Tr., at 49:21-22, 195:10-13, 198:14-15), has prior experience handling securities litigation (*id.* at 8:12-14, 9:11-24, 10:2-12, 11:24-12:7, 13:2-14:15), and, as discussed in detail below, has a firm understanding of the allegations asserted here (*see supra* Section I.D.2).[6]

---

[6] Moreover, if Defendants take issue with the basic fact that the Fund has employed numerous securities firms to monitor its portfolio, *Iron Workers* supports Plaintiff's application on that score as well. *See, e.g.,*

### 3. The Fund's Use of an "Outside" General Counsel is a Non-Issue with Respect to Its Adequacy to Serve as Class Representative

Defendants' argument regarding Plaintiff's use of an "outside" General Counsel has no bearing on this analysis. Tellingly, Defendants fail to cite a single case holding that such an arrangement precludes a plaintiff from serving as a class representative. On the contrary, Jones's explanation that "[u]p to now [the Fund's] legal requirements haven't required a full time attorney," *see* Depo. Tr., at 49:19-20, only demonstrates the Fund's prudence – not any lack of control of its securities litigation attorneys. *Id.* at 7:20-21; *see also id.* at 27:11, 48:12.

### C. Plaintiff has Played an Active Role in this Litigation and has Exercised Significant Oversight over Its Securities Litigation Counsel

According to Defendants, "Plaintiff has vested outside counsel with unfettered control and has taken a passive role in this litigation" and "left all of the litigation decisions in this case exclusively within the hands of its attorneys." Defs.' Mem. at 11, 14. Defendants cite only the fact that Plaintiff did not personally draft the Complaint or verify the facts contained therein as support for this fallacious argument. *See id.* at 14-15. Once again, however, the facts and law prove to be a roadblock for Defendants' unfounded assertions. As an initial matter, Defendants fail to cite a single relevant case demonstrating that such conduct disqualifies a party from acting as a class representative. That is no surprise, as the Fund was well within its province to rely on competent counsel to perform that function. *See, e.g., Silverman*, 259 F.R.D. at 173 ("[I]t is well established that in complex actions such as securities actions, a plaintiff need not have expert

---

*In re GE Sec. Litig.*, No. 09 Civ. 1951(DC), 2009 U.S. Dist. LEXIS 69133, at *16-17 n.4 (S.D.N.Y. July 29, 2009) (noting that in *Iron Workers*, "[t]he Court found it less troubling that a number of free monitoring services were utilized instead of just one because, according to the Court, the conflict of interest is more significant if a monitoring firm is guaranteed to bring the potential lawsuit"); *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 173 (N.D. Ill. 2009) (same).

knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected.") (quotations omitted).

Yet despite possessing a right to rely heavily on counsel for litigation matters, the record reflects nonetheless that the Fund played an active role in filing the Complaint against Defendants. In particular, Plaintiff met with its money manager to discuss possible litigation against S&W (Depo. Tr., at 138:3-139:22), consulted with counsel regarding the factual allegations in the Complaint (*id.* at 42:23-43:2), "provided what information [the Fund] had" in helping to develop the facts in the Complaint (*id.* at 133:13-134:3), reviewed the information provided by confidential witnesses before the complaint was filed (*id.* at 166:5-22), and reviewed the Complaint prior to filing (*id.* at 133:24-134:3).

Moreover, the record is replete with evidence that the Fund *subsequently* took an active role in supervising this litigation, including without limitation the following:

- Lead Counsel remains in contact with the Fund's General Counsel (Edwards) on a regular basis and the Fund's Executive Director (Jones) "on an as needed basis" (Depo. Tr., at 37:21-38:13);

- Lead Counsel keeps the Fund apprised of material information (*id.* at 38:14-15);

- Lead Counsel provides the Fund with regular reports as to the status of the litigation (*id.* at 39:4-7);

- Lead Counsel discusses the "day-to-day running of the litigation" both with the Fund's Executive Director Jones and General Counsel (Edwards), "brief[ing] us as the case goes along and what's going on," and "shar[ing] with us litigation strategy" in order to get the Fund's feedback (*id.* at 41:8-20);

- "[Lead Counsel]'s attitude is that . . . [the Fund] need[s] to be informed, that we need to be part of the decision process. And we are [but] we don't get involved in the minutia [(sic)] of the case unless [the Fund's] general counsel does" (*id.* at 41:23-42:4);

- Jones prepared for a Rule 30(b)(6) deposition by, among other things, reviewing the pleadings "a number of times" (*id.* at 42:5-23);

- Jones "play[ed] a role in reviewing [the] contents" of Plaintiff's opening brief in support of class certification and reaffirmed under oath that Plaintiff "possess[es] the necessary skill and expertise to manage this litigation for the benefit of the class" (*id.* at 50:10-21); and

- The Fund's attorneys briefed Jones regarding this Court's decision on Defendants' motion to dismiss the Complaint and discussed the implications of that decision with him (*id.* at 213:12-18).[7]

In light of this evidence, Defendants' argument that the Fund failed to monitor and supervise this litigation should be afforded no weight whatsoever.[8]

**D.     Armed with a Thorough Understanding of the Case and Knowledge of the Facts, the Fund is Well Qualified to Manage this Litigation**

"In complex actions such as this one, named plaintiffs are not required to have expert knowledge of all details of the case." *Transkaryotic Therapies,* 2005 U.S. Dist. LEXIS 29656, at *15 (citing *In re Lupron Marketing and Sales Practices Litig.,* 228 F.R.D. 75, 90 (D. Mass. 2005)); *see also In re NTL Sec. Litig.,* No. 02 Civ. 3013, 2006 U.S. Dist. LEXIS 5346, at *43 (S.D.N.Y. Feb. 14, 2006) (noting that, in complex litigations such as securities actions, plaintiff need not have expert knowledge of all

---

[7] Put in context, Jones's testimony that the Fund relied on counsel's expertise in the securities arena to handle litigation strategy (including drafting the complaint), *see* Defs.' Mem. at 14-17, actually supports Plaintiff's motion. Indeed, that testimony manifestly demonstrates that the Fund exercised prudent oversight over the litigation and did not micromanage strategy decisions about which they are not required to have expertise. Rather, the Fund assigned its General Counsel – whom Defendants derisively refer to as its "so-called 'general counsel'" (Defs.' Mem. at 15) – to work with Lead Counsel to make sure that the litigation was being prosecuted appropriately by experienced securities litigators chosen by the Fund's Board to prosecute the case, while the Fund's Executive Director made litigation decisions "on an as needed basis" at appropriate times during the litigation. Depo. Tr., at 37:18-38:3.

[8] As a result, all of the cases Defendants cited as support for the contrary conclusion are unavailing. For example, the circumstances in *In re Monster Worldwide, Inc. Sec. Litig.,* 251 F.R.D. 132, 135 (S.D.N.Y. 2008), are not the least bit analogous. *See* Defs.' Mem. at 17. In *Monster,* the court rejected one of two proposed class representatives because he had absolutely no understanding of the basic facts of the litigation, such as the name of the stock at issue in the case, the names of the defendants, whether the fund ever owned Monster stock, and whether he had ever seen the complaint, let alone read it before it was filed – all testimony the Court found "appalling." *Id.* at 135-36; *see also Rolex,* 136 F.R.D. at 666 (finding proposed class representative inadequate because he "contributed nothing to the drafting of the complaint"). Moreover, the *Wagner v. Barrick Gold Corp.,* 251 F.R.D. 112, 118 (S.D.N.Y. 2008), case directly supports Plaintiff's motion. In *Wagner,* the Court **_granted_** plaintiffs' class certification motion after concluding that the defendant had not presented "probative evidence . . . that Plaintiffs' counsel [were] unqualified, and instead . . . attack[ed] the character and intelligence" of the proposed class representative (to no avail). *Id.* (citation omitted).

aspects of case). Rather, it is enough that a plaintiff understands "the nature of his proposed role in the litigation and demonstrated his willingness to carry it forward." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61-62 (2d Cir. 2000) (citing *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 370-74 (1966)). As a result, attacks on the adequacy of a class representative based on its purported ignorance of the case minutiae are rarely deemed appropriate. *See, e.g., In re Organogenesis Sec. Litig.,* 241 F.R.D. 397, 407-08 (D. Mass. 2007) (rejecting attack related to plaintiff's failure to read the amended complaint, limited understanding of some aspects of case, and failure to confer regularly with counsel).[9]

As shown below, the record unequivocally demonstrates that beyond possessing the basic knowledge necessary to act as a class representative, the Fund has a firm grasp on the facts and issues underlying this litigation. Accordingly, this Court should reject attacks based on Plaintiff's purported ignorance of the finer points of this complex case, which – judging by Defendants' numerous misconceptions of the relevant facts and law – can be difficult even for experienced practitioners to comprehend.

### 1.   *Plaintiff Understands Its Role as Class Representative*

Simply put, the Fund completely understands its role as class representative. In particular, Jones testified that the Fund has "a fiduciary duty to the class" (*see* Depo. Tr., at 44:16-17) which "takes in a lot" (*id.* at 44:19), including without limitation:

- "a duty not to show favoritism to our loss as compared to the other members of the class" (*id.* at 45:2-4);

---

[9] *See also Rosen v. Textron, Inc.,* 369 F. Supp. 2d 204, 215-16 (D.R.I. 2005) (rejecting defendants' attacks on plaintiffs' adequacy – including history of abdicating decision-making to counsel, failure to read pleadings and unfamiliarity with certain facts); *Kinney v. Metro Global Media, Inc.,* No. 99-579 ML, 2002 U.S. Dist. LEXIS 18628, at *13-17 (D.R.I. Aug. 22, 2002) (rejecting adequacy argument because plaintiffs did not provide "false, misleading or contradictory testimony" regarding basic facts of case).

- "a duty to insure that [the Fund has] competent counsel representing the class" (*id.* at 45:6-8);

- a duty to ensure "a quality prosecution of this case" by "a skillful firm" (*id.* at 45:23-25);

- "hav[ing] the experience and the expertise to understand how these cases are carried out" (*id.* at 51:2-3); and

- "a duty to keep expenses down to a minimum in relationship to the . . . litigation" (*id.* at 45:4-6).

Moreover, when asked what the Fund was doing to ensure a quality prosecution of the case, Jones testified that the Fund was "observing the case as it matriculates through the Court," and, significantly, has "assigned the general counsel of the pension system to work in close coordination with the Berman DeValerio firm." *Id.* at 46:4-9. Finally, Jones concluded that the Fund was "very satisfied with [Lead Counsel's] prosecution of the case." *Id.* at 46:9-10. Thus, contrary to the argument that the Fund lacks an understanding of its role as class representative, Jones's testimony leaves no doubt that the Class has in the Fund a faithful guardian of its interests.

### 2.   *Plaintiff has a Thorough Understanding of the Case*

Defendants argue that the Fund should be disqualified because it does not have an adequate knowledge of the case. *See* Defs.' Mem. at 17-21. Their primary tactic is to highlight, out of context, the few instances where the Fund's knowledge of a nuanced or tertiary aspect of Plaintiff's Complaint is incomplete or somehow purportedly suspect. *Id.* That argument, however, completely ignores the forest for the trees. As the excerpts from Jones's testimony highlighted below make perfectly clear, the Fund thoroughly understands the case. That it may not have mastered every detail of a complex, 82-page securities fraud class action complaint does not leave so much as a dent in that knowledge.

13

As an initial matter, before he was even shown the Complaint, Jones provided a

summary of the claims against S&W that would be hard to improve upon.  At length,

Jones testified to the Fund's understanding that:

> [d]uring the class period Smith and Wesson made certain representations to the
> financial public, including our investment managers, that were overly optimistic
> in relationship to the internal data they had [sic], or that they knew that made
> those representations incorrect.  That they overstated the demand for their
> products and created a false value of the stock that caused the stock to either go
> up or hold value when it shouldn't have.  We at the [Fund] find this objectionable
> and quite frankly, we feel like we got cheated. . . .  I did not personally hone in on
> the accuracy of their financial statements.  What I honed in on was their guidance
> for future performance.  And I think that's what the market also honed in on.  And
> I think that's the basis of the complaint.

Depo. Tr., at 130:2-131:6.[10]

Moreover, Jones's understanding of this case did not waver when Defendants

quizzed him about particulars of the Complaint.  For example, when asked for his

understanding of what a major decline in product demand meant as alleged in the

Complaint, Jones accurately testified that the concept meant that S&W was "producing

firearms [that] weren't being sold and they were stacking up on them and their inventory

was growing."  *Id.* at 141:5-10.  "[W]orse than that, they were saying that – and they

were forecasting [robust] sales when at the time they weren't moving the product."  *Id.* at

141:15-19; *see also id.* at 142:12-143:8 (stating further that "in fact the products weren't

moving at all or very little and that inventory was building up in their warehouse" and

---

[10] Significantly, Jones further refined that synopsis of the Complaint in response to subsequent questioning.
*See id.* at 148:21-149:9 (understanding that "Smith and Wesson was experiencing a major decline in
product demand in June, 2007" and that Defendants' "statements of forward performance . . . were
inappropriate . . . [i]n relationship to what they knew was actually happening"); *id.* at 155:24-25 ("What
I'm saying is the company made bogus claims in regards to their demand."); *id.* at 149:4-9 ("Well, what I
mean is in relationship to . . . statement of forward performance, . . . the statements were inappropriate . . .
[i]n relationship to what they knew was actually happening."); *id.* at 150:9-15 ("I'm not tying to current
sales. ... I'm tying it to they're not getting orders and they're telling everybody that we've got all kinds of
future growth in sales, when they were being reported to internally that they've not had any sales going
on."); *id.* at 169:22-170:19 (testifying that S&W's orderometer reports reflected that "the demand. . . . I
think the gentlemen were making investment conference calls that had nothing to do with what their
internal people were telling them").

understanding that S&W "hadn't disclosed the backup in inventory"). Similarly, Jones

confirmed his understanding that Defendants' reference in public statements to

"increased demand" was "clearly a misstatement" because "there was no increased

demand" and certainly "[n]ot enough increased demand to justify a fiscal 2008 projection

as rosy as they had." *Id.* at 177:16-23; *see also id.* at 181:1-7 (testifying that on July 16,

2007 Defendants "were seeing significant decline in orders. Such a large decline it could

not possibly justify that strong" of a statement regarding significant growth of business);

*id.* at 164:1-4 (testifying that, to his understanding, "the whole demand had already

started slipping" by June 2007).

Furthermore, Jones testified to his understanding of numerous detailed facts

concerning the allegations in the Complaint, including without limitation the following:

- That the Class Period began in June 2007 and ended in December 2007 (*id.* at 200:13-18);

- That "the reason why [December 6, 2007 is] the end of the class period is because that's when they, as they said here, the truth comes out" (*id.* at 200:13-18);

- That October 29, 2007 was "the time when [Defendants] first started owning up to their problems" (*id.* at 192:22-193:1) and that, in general, S&W's corrective disclosures publicly revealed the truth about Defendants' fraud (*id.* at 156:3-10);

- That S&W's October 29 disclosure was considered partially corrective because it disclosed "[t]he overhyped forward guidance . . . [c]oupled with what they knew internally during the summer months, and even before that . . . [t]hat demand orders were dropping" (*id.* at 203:11-24);

- That the December 6 disclosure was considered the final corrective disclosure because "the truth that's emerging is the final owning up publicly by Smith and Wesson management that they've been faced with a decline in orders" and that this allegation appears on "page 54 in the underlined part of the Complaint" (*id.* at 206:21-207:6);

- That Defendant Monheit had been dismissed from the litigation (*id.* at 213:1-6);

- That Plaintiff alleged that senior officers and directors had engaged in "highly suspicious" insider trading during the Class Period (*id.* at 191:3-7);

15

- That the Fund was aware that Waddell and Reed, one of its money managers, had purchased all of the Fund's stock in S&W during the Class Period (*id.* at 52:16-22);

- That Exhibit 8 at his deposition was the attachment to the Fund's Lead Plaintiff certification setting forth the schedule of Plaintiff's Class Period stock purchases in S&W that gave Plaintiff standing to assert these claims (*id.* at 77:5-24).

Jones's understanding of the case even stretched into arcane legal concepts arising out of Plaintiff's allegations.  For example, Jones testified to his understanding of the difference between "forward-looking" statements and statements of historical fact – a key legal distinction relevant to this action.  *Id.* at 176:25-177:6.  Similarly, Jones implicitly testified to an understanding of the concept of "partially corrective disclosures," noting that the truth about Defendants' fraudulent conduct was "partially" and "somewhat" revealed to the market on October 29, 2007, and that "Defendant's charade came to an end on December 6, 2007 when the company revealed the true impact that the lack of consumer demand and excessive inventory accumulation had an unjustified earnings outlook for fiscal year 2008." *Id.* at 156:3-10, 162:6-12.

In light of Jones's testimony, Defendants vain attempt to argue that the Fund has an insufficient understanding of the case utterly lacks credibility, as the Fund manifestly understands the case at bar.[11]  Defendants' citation to a few cherry-picked misconceptions or misunderstandings that the Fund had with respect to its highly complicated, 82-page Complaint in no way undermines that knowledge.  To the contrary,

---

[11] Thus, Defendants' citations to *Darvin v. International Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) and *Cohen v. Laiti,* 98 F.R.D. 581, 584 (E.D.N.Y. 1983) are misplaced.  *See* Defs.' Mem. at 23. In *Darvin*, the proposed class representative was rejected because of significant inconsistencies in his deposition testimony, including that: (1) his testimony changed drastically regarding particular documents relied upon and whether the materials affected his decision to purchase the stock; (2) he repeatedly professed a poor memory regarding the complaint; and (3) his knowledge of the facts were "extremely limited or nonexistent." 610 F. Supp. at 256-57. Similarly, in *Laiti*, the court rejected the class certification motion due to *verifiably* false testimony. For example, in addition to blatant inconsistencies with the testimony of the proposed class representative and his broker, the class representative falsely contended that he purchased the stock based on statements in the company's 1980 and 1981 Form 10-Ks, when he never even saw the 1980 10-K and the 1981 10-K had not yet been filed. *Laiti,* 98 F.R.D. at 582-83.

the only thing it illustrates is how futile Defendants' effort is to defeat class certification

on grounds of the Fund's adequacy to serve as a class representative.[12]

## II.     CERTIFICATION OF THE CLASS IS APPROPRIATE BECAUSE COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES

Defendants argue that individual questions of fact and law predominate over

common questions because "Plaintiff fails to provide any evidence *establishing* loss

causation." *See* Defs.' Mem. at 29 (emphasis added).  As discussed in Plaintiff's opening

brief, however, the question on class certification is not whether Plaintiff can *prove* the

elements of its securities fraud claims, *e.g.*, loss causation; rather, the question is whether

Plaintiff has met the requirements of Rule 23.  The predominance requirement mandates

only "that the questions of law or fact common to class members predominate over any

questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  As shown

below, Plaintiff has squarely met that burden with respect to all elements of its claims –

including reliance and loss causation, the only elements with respect to which Defendants

ostensibly argue that individual questions predominate.[13]

---

[12] A prime example of Defendants' attempt to disingenuously pick apart Jones's testimony concerning his recollection of the case is where Defendants assert that "amazingly" Jones did not know that the Company's peculiar fiscal year was from May to April. *See* Defs.' Mem. at 20.  First of all, that particular fact is meaningless as it pertains to serving as a class representative. Notwithstanding, Jones testified later in the deposition that "I see reading in that they're not [on] a . . . calendar fiscal year[]," so to the extent that Defendants think it is important for a class representative to know that fact, they can rest assured that going forward the Fund has been so advised.  Depo. Tr., at 173:23-25, 176:10-11.

[13] Defendants' opposition memorandum continually conflates the reliance and loss causation elements of Plaintiff's claims when, in fact, those elements are wholly distinct from one another. *See* Defs.' Mem. at 26-27.  Indeed, contrary to the thrust of Defendants' confusing argument, evidence of "loss causation" is totally irrelevant to Plaintiff's ability to demonstrate "reliance" by virtue of the "fraud-on-the-market" presumption. *See In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 284, 287 (D. Mass. 2009) (rejecting loss causation argument because plaintiff adequately demonstrated that company's securities traded in efficient market).  Thus, the Court's evaluation of whether Plaintiff has met its Rule 23 burden with respect to reliance must be done independently of its assessment of whether Plaintiff has met its burden with respect to loss causation.

17

A.    **Despite Defendants' Effort to Foster Mini-Trials, a Merits Inquiry is Only Appropriate Where the Merits Overlap with Rule 23 Criteria**

Although Defendants concede that plaintiff need only "put[] forth ***basic facts***

demonstrating all elements of Fed. R. Civ. P. 23," they nevertheless argue for a much

broader scope of inquiry than courts in the First Circuit conduct on class certification.

*See* Defs.' Mem. at 5. As the First Circuit has held, however, a court's Rule 23 inquiry is

strictly limited to issues that implicate the claim's amenability to class action treatment.

*See Boston Scientific*, 604 F. Supp. 2d at 281(citing *In re New Motor Vehicles Canadian*

*Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008)). Thus, contrary to Defendants'

argument, inquiry into the merits of a plaintiff's claims is restricted *only* to those areas

where "the merits overlap with the Rule 23 criteria." *New Motor Vehicles*, 522 F.3d at

24.  In that regard, the First Circuit specifically cautions against "turn[ing] the class-

certification proceeding into an *unwieldy* trial on the merits."[14]  *Id.* at 1 (emphasis in

original).  As shown in Plaintiff's opening brief and buttressed below, Plaintiff has

demonstrated that class certification is appropriate under the relevant standard.

B.    **Given that Plaintiff has Proffered Basic Facts Showing that the Fraud-on-the-Market Presumption Applies Here, Common Questions of Reliance Predominate**

To properly invoke the "fraud-on-the-market" presumption in this Circuit, a

plaintiff must show that the market for a particular stock was "efficient" during the class

---

[14] In just one of many examples where Defendants' overreach, they spuriously argue that this Court's March 26, 2009 Order sustaining the allegations of Plaintiff's complaint significantly "impacts" this Court's predominance inquiry under Rule 23 simply because the Order noted that false statements that are ultimately found to be forward-looking are not actionable. *See* Defs.' Mem. at 28-29. To the contrary, there is no reason whatsoever for the Court to inquire into the merits of those false statements, because any such questions, on their face, are clearly common to all class members.  Accordingly, despite Defendants' best efforts to create a mini-trial on that issue, the Court's rigorous analysis on the subject should end right there.  Moreover, this Court should prevent Defendants' misconceptions of the standard from resulting in a mini-trial on any other issues that are not susceptible to evaluation under Rule 23.

period, thereby eliminating the need to prove individual reliance. *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1,7 (1st Cir. 2005); *see also In re Credit Suisse AOL Sec. Litig.*, 253 F.R.D. 17,25 (D.Mass 2008). As stated in Plaintiff's opening brief, however, a plaintiff seeking class certification need only present ***"basic facts"*** that the "fraud-on-the-market" presumption ***could be*** invoked. *See New Motor Vehicles*, 522 F.3d at 25 ("At the class certification stage...plaintiffs needed to present 'basic facts' that the fraud-on-the-market presumption could be invoked, even though its actual applicability was to be resolved at trial.")(citation omitted). Therefore, if Plaintiff submitted requisite "basic facts" demonstrating that it could prove that the market for S&W's stock was efficient, common questions of reliance unquestionably would predominate, because Plaintiff could then invoke the "fraud-on-the-market" presumption and would not have any obligation to prove individual reliance.

Plaintiff has already made such a showing in its opening brief.[15] Yet, to eliminate any vestige of Defendants' argument, Plaintiff has submitted herewith the Declaration of Candace L. Preston in Support of Plaintiff's Motion for Class Certification ("Preston Declaration"), which demonstrates unequivocally that S&W's stock traded in an efficient market during the Class Period.  With that showing, Plaintiff has overwhelmingly demonstrated that common questions predominate over individual questions of reliance.

### *1.    Plaintiff has Demonstrated that the Market for S&W's Stock was Efficient During the Class Period*

---

[15] Indeed, Defendants appear to have conceded as much.  The sole basis that Defendants previously advanced in support of bifurcating class certification and merits discovery was that Plaintiff could not invoke the "fraud-on-the-market" presumption on class certification because it could not prove that the market reacted to S&W's statements, *i.e.,* that the market was not "efficient." *See* Dkt. No. 79, Defendants' Memorandum of Law on the Need for Phased Discovery and Motion Practice on Class Certification, at 3. Defendants, however, have abandoned all "efficiency" arguments on class certification, tacitly admitting that Plaintiff will have no difficulty demonstrating that S&W's stock traded in an efficient market.

As noted in Plaintiff's opening brief, the First Circuit has adopted the five-part test articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), to assist in determining the existence of an "efficient" market. *See* Pls.' Mem. at 15; *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) (adopting *Cammer* test to assist in determining existence of "efficient" market necessary to invoke "fraud-on-the-market" presumption). Plaintiff's opening brief further proffered the requisite "basic facts" sufficient to show that, under the *Cammer* factors, Plaintiff could prove at trial the existence of an "efficient" market for S&W stock. *See* Pls.' Mem. at 15. Considering that Defendants have failed altogether to address the *Cammer* test – let alone rebut Plaintiff's attendant showing – the Court's inquiry should cease and common questions of reliance should be found to predominate.

Yet even if this Court further considers the superficial challenge that Defendants have mounted as to the applicability of the "fraud-on-the-market" presumption, which it should not, Plaintiff has solidly buttressed its showing with the Preston Declaration. Based on the following facts described in the Preston Declaration and summarized below, an "efficient" market for S&W's stock indisputably existed throughout the Class Period:

      **a.**     **S&W's Stock was Actively Traded**

During the Class Period, S&W had an average of 40 million total shares outstanding and an average weekly trading volume as a percentage of shares outstanding of 5,865,950 shares. *See* Preston Declaration, at ¶¶15, 18. Moreover, 80% of S&W's stock was held by outside shareholders during the Class Period, including 200 institutional investors such as banks, investment advisors, pension funds and research firms, many of which traded shares on behalf of individual investors. *Id.* ¶¶15-17. As a

result, the turnover as a percentage of average shares outstanding during the Class Period

was 14.6%, far exceeding the *Cammer* benchmark of 1-2%.[16]  *Id.* at ¶18.

### b.     Information on S&W's Stock was Widely Available

First, no less than six securities analysts regularly covered S&W's stock during

the Class Period, publishing at least thirty (30) reports in or around that time.[17]  *Id.* at

¶19; *see also Xcelera*, 430 F.3d at 514-16 (stating that presence of only one securities

analyst did not defeat determination that efficient market existed).  Moreover,

information from those reports was readily available on numerous electronic news

services, such as Bloomberg, LEXIS/NEXIS, First Call, Reuters, and Dow Jones.  *See*

Preston Declaration, ¶¶19-20 & Ex. C.  Second, S&W took affirmative steps to inform

the investing public about its activities, including:  (1) disseminating press releases that

were widely available through newspapers, electronic newswires and databases, and on

the Internet; and (2) hosting investor conference calls, the recordings and text of which

were available through news services such as Bloomberg and Dow Jones.  *Id.* ¶20.  Third,

trading data (including stock prices and share volume) for S&W's stock was

disseminated throughout the investment community in newspapers, through electronic

systems such as Bloomberg, and on the Internet.  *Id.* ¶22.  Finally, S&W filed periodic

reports with the United States Securities and Exchange Commission ("SEC") that

---

[16] *See Cammer*, 711 F. Supp. at 1286 ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one."); *see also Xcelera*, 430 F.3d at 514 ("A high average weekly trading volume suggests market efficiency since it implies significant investor interest in the company and a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.) (internal quotations omitted).

[17] Parenthetically, there is no inconsistency between Pls.' Mem. which references coverage by nine stock analysts, and the Preston Declaration.  *See* Pls.' Mem. at 16.  The Preston Declaration conservatively focused on coverage by only six analysts for purposes of Plaintiff's loss causation analysis, but acknowledged that several others provided more sporadic forms of coverage.  *See* Preston Declaration, at ¶19 (noting that "at a minimum," six analysts covered S&W's securities).

provided important information to the market, including business conditions affecting the

Company's financial performance and other matters affecting its stock price. *Id.* at ¶23.

### c.    S&W's Stock Traded on the NASDAQ and had Numerous Market Makers

S&W's common stock has traded on the NASDAQ GS since 2006.[18]  *Id.* at ¶25.

Trading on the NASDAQ GS is facilitated by at least thirty (30) market makers through

an electronic exchange.[19]  *Id.* at ¶27.  Acknowledging the significance of that broad range

of market makers, Defendant Golden stated that "[w]e believe that this trading

environment will provide greater recognition for Smith & Wesson, as well as increased

liquidity and value for our stockholders."  *Id.* at ¶26 (quoting NASDAQ website).

### d.    S&W Filed Form S-3 Registration Statements

Form S-3 is an abbreviated public disclosure form that may be used only where a

registrant has, among other things, satisfied requirements concerning disclosures,

dissemination of information, and market capitalization – the presumption being that the

SEC "*belie[ves] that the market operates efficiently for these companies, i.e., [all public

information] has already been disseminated and accounted for by the market place*."

*Cammer*, 711 F. Supp. at 1284 (emphasis in original).  As a consequence, "[t]he

existence of Form S-3 status is an important factor weighing in favor of a finding that a

market is efficient."  *Id.* at 1285.  Here, S&W was eligible to file a Form S-3 under SEC

rules throughout the Class Period and, in fact, did file a Form S-3 on March 12, 2007,

that was later amended (on June 22, 2007) and remained effective throughout the Class

Period and beyond.  Preston Declaration ¶31.  In compliance with Form S-3

---

[18] The NASDAQ GS market is a segment of the NASDAQ Global Market with more rigorous listing standards than the NASDAQ Global Market.  *Id.* at ¶25.

[19] *See also Credit Suisse*, 253 F.R.D. at 27 (stating that numerous market makers demonstrated that market was efficient).

requirements, S&W registered more than 6.4 million shares of common stock and 4%

Senior Convertible Notes due in 2026 with a face value of $80,000,000 and timely filed

various SEC forms, including 10-Ks (annual reports) and 10-Qs (quarterly reports). *Id.*

### e.      There is A Cause and Effect Relationship Between S&W's Stock Price and Unexpected Corporate Events

The fifth *Cammer* factor, a prime indicator of an efficient market, concerns

"empirical facts showing a cause and effect relationship between unexpected corporate

events or financial releases and an immediate response in the stock price." *See Cammer*,

711 F. Supp. at 1287. The most universally accepted method to determine the existence

of such a relationship is called an "event study," which measures the effect of new

information on the market prices of a company's publicly traded securities. *See* Preston

Declaration, ¶¶32-38. The event study conducted by Plaintiff's expert included an

extensive review of Company-specific news and information. *Id.* ¶34. In addition,

several comparative market models were included to determine the relationship, if any,

between S&W's stock price and general market and industry-specific information. *Id.*

¶¶37-38. In particular, the event study included two market models that quantified the

mathematical and statistical relationships, respectively, between changes in the price of

S&W's stock and: (1) changes in the NASDAQ Composite Index; and (2) changes in the

prices of Sturm Ruger & Co., Taser International, Inc., and an index of companies to

which analysts compared S&W. *Id.* Plaintiff's event study manifestly confirmed that the

release of unexpected, material, new information concerning S&W was associated with

significant changes in S&W's stock prices and indicated that the market for S&W's stock

was informationally efficient during the Class Period. *Id.* ¶¶39-53; *see also Credit

Suisse*, 253 F.R.D. at 27 (holding that plaintiff's expert adequately determined that

23

market for company's stock was efficient because its "stock price adapted quickly to new information); *Boston Scientific*, 604 F. Supp. 2d at 284 (noting that expert demonstrated that defendant company's stock price changed quickly during class period in response to new information such as company announcements).

*     *     *     *     *

In light of those facts, there is simply no doubt that Plaintiff has adduced "basic facts" sufficient to demonstrate that it could prove the existence of an "efficient" market for S&W's stock, thereby allowing the "fraud-on-the-market" presumption to apply and common issues to predominate over any individual issues of reliance.

### 2. *Defendants Cannot Rebut the "Fraud-on-the-Market" Presumption of Reliance at the Class Certification Stage*

Defendants' argument that the "fraud-on-the-market" presumption has somehow been rebutted is both legally and factually baseless. As a legal matter, the First Circuit has held that the presumption is rebuttable ***only*** at summary judgment or trial and ***not*** at the class certification stage. *See PolyMedica*, 432 F.3d at 7 n.10 (noting that Defendants can rebut "fraud-on-the-market" presumption at trial); *see also Boston Scientific*, 604 F. Supp. 2d at 286 ("[A] plaintiff seeking class certification in the First Circuit need only present basic facts that the fraud-on-the-market presumption could be invoked, while the theory's *actual* applicability should be resolved on summary judgment or at trial.") (internal quotations omitted, emphasis in original). Moreover, it is impossible for Defendants' dubious rebuttal theory – the alleged failure to show loss causation – to gain any traction at the class certification stage, as questions of loss causation are common to all class members. Consequently, they have no bearing on the predominance (or any other) element of the Rule 23 analysis. *See Boston Scientific*, 604 F. Supp. 2d at 281

24

(holding that Court's rigorous Rule 23 inquiry extends only to those questions that implicate the claim's amenability to class action treatment); *see also Credit Suisse*, 253 F.R.D. at 30 ("To require plaintiff to show more than market efficiency at this stage would conflate the issue of whether common issues will dominate the merits decision with the merits decision itself.") (internal quotations omitted).

Yet even if this Court were to consider rebuttal evidence, which it clearly should not, Defendants have not even set forth a viable argument to refute the presumption, much less factual support for that argument. In order to rebut the "fraud-on-the-market" presumption, Defendants must:

> disput[e] . . . the elements giving rise to the presumption (*e.g.*, that the company's shares traded in an efficient market), or by showing that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false.

*Credit Suisse,* 253 F.R.D. at 30, n.15 (internal quotations omitted). In other words, if Defendants are unable to attack the efficiency of the market for S&W's stock, their only viable rebuttal tactic would be to sever the link between Defendants' false statements and Plaintiff's purchase of S&W's stock at an artificially inflated price.

Defendants have done nothing of the kind. Rather, they argue that a purported lack of loss causation caused by an alleged absence of a connection between the fraud and any curative statement somehow rebuts the "fraud-on-the-market" presumption. *See* Defs.' Mem. at 26. Not only does that argument fail to rebut the presumption, it demonstrates a stunning lack of understanding of the doctrine itself, which concerns the ***reliance*** element, not the ***causation*** element, of Plaintiff's claims.[20]

---

[20] Highlighting Defendants' misconceptions about the doctrine, Defendants erroneously contend that *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), requires Plaintiff to prove loss causation as either part of a Rule 23 analysis or as a necessary predicate to invoking the "fraud-on-the-market" presumption. *See* Defs.'

Although not made explicit, Defendants' specious rebuttal argument appears to be loosely based on the widely disfavored holding in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007). *See* Defs.' Mem., at 27, 30 n.23 (citing *Oscar* for proposition that plaintiff must prove loss causation in order to trigger "fraud-on-the-market" presumption).[21] As the dissent in *Oscar* noted, however, the majority decision directly contravenes Supreme Court precedent.[22] As a result, *Oscar's* holding has been widely criticized and, indeed, rejected by a long line courts – including many within this Circuit. *See, e.g., Boston Scientific*, 604 F. Supp. 2d at 286 ("Recent First Circuit authority indicates that evaluation of evidence of market impact at the class certification stage should differ from the approaches of the Fifth Circuit and Second Circuit."); *Credit Suisse*, 253 F.R.D. at 29 ("The *commonality* of the ultimate reliance inquiry turns on whether the market for the security is efficient, not on the materiality or market impact of defendants' particular statements.") (emphasis in original) (citing *PolyMedica*, 432 F.3d at 8).[23]

---

Mem. at 30-31. **In point of fact, *Dura* has nothing to do with class certification.** Nor does *Dura* list causation as a prerequisite to using the "fraud-on-the-market" doctrine as a means of proving reliance. Rather, that case benignly identifies reliance and loss causation as separate elements of a securities fraud claim, each of which is subject to separate proofs. 544 U.S. at 341-42. Consequently, Defendants' stance is woefully misguided, as *Dura* provides no support for any argument that Plaintiff ***ever*** needs to show loss causation prior to invoking the "fraud-on-the-market" presumption **_or_** that the Court's rigorous Rule 23 analysis ***ever*** requires proof of loss causation.

[21] *Oscar* held that market efficiency could not be shown without proof of loss causation. 487 F.3d at 264-65.

[22] *See* dissent, *Oscar*, 487 F.3d at 272 ("[T]he majority departs drastically from the Supreme Court's decision in [*Basic*] which held that securities class action plaintiffs are entitled to a rebuttable presumption of reliance . . . if the plaintiffs traded in the stock at issue during the proposed class period in reliance on the integrity of the … market. … The majority's decision is … a breathtaking revision of securities class action procedure that eviscerates *Basic*'s fraud-on-the-market presumption, creates a split from other circuits by requiring mini-trials on the merits of cases at the class certification stage…").

[23] *See also, e.g., Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 U.S. Dist. LEXIS 17747, at *11 (S.D.N.Y. Mar. 6, 2008) (rejecting *Oscar*); In re *HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 283 (N.D. Ala. 2009) (same); In re *Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107-08 (E.D. Va. 2009) (same) (internal citation omitted); In re *LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("The breadth of the *Oscar* holding is striking. It essentially injects what is fundamentally a merits inquiry into the class-certification inquiry through the back door: it requires the *plaintiff to prove* loss causation in order to avail

Mindful of that admonition, district courts in this Circuit have rejected merits inquiries into Exchange Act elements, including loss causation, that have no bearing on Rule 23 issues.[24]  *See Credit Suisse*, 253 F.R.D. at 30 ("Defendants' arguments regarding market impact, while certainly not insubstantial, do not address the purposes of Rule 23."); *Boston Scientific,* 604 F. Supp. 2d at 287 ("Although defendants have raised colorable arguments regarding [plaintiff's] ability to prove loss causation, those issues are more properly addressed on summary judgment or at trial.").[25]  Accordingly, First Circuit courts offer no soft landing for rebuttal arguments to the "fraud-on-the-market" presumption that are based on *Oscar*, as Defendants' argument is.[26]

---

itself of the benefit of the fraud-on-the-market presumption . . . *Oscar* placed the Fifth Circuit in a minority -- indeed, apparently solitary -- stance among the circuits; it is in no small amount of tension with the Supreme Court's decision in *Basic*...; and although the Ninth Circuit has yet to address the issue . . . this circuit's precedent strongly suggests it would reject such a rule.") (emphasis in original).

[24] As a consequence, Defendants' citation to *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, No. 08-11195, 2010 U.S. App. LEXIS 3226 (5th Cir. Feb. 12, 2010), is completely inapposite, because that case, too, is founded on the Fifth Circuit requirement – inapplicable here – that a Plaintiff must *prove* its securities fraud claim at the class certification stage. *See* Defs.' Mem. at 31 & n.24.

[25] Remarkably, Defendants somehow argue that *Boston Scientific* supports the proposition that "the fraud-on-the-market presumption is rebutted because plaintiff cannot establish loss causation."  Defs.' Mem. at 26.  That interpretation of *Boston Scientific*, however, could not be more off base.  In *Boston Scientific*, the Court specifically held that while the argument that the subsequent disclosure of the truth affected the market price of Boston Scientific stock in a statistically significant manner does "implicate [plaintiff's] ability to prove loss causation, an essential element in a securities fraud action, *I find that this does not bear on Rule 23(b)(3)'s requirement that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'*"  604 F. Supp. 2d at 284 (citation omitted, emphasis added).  Moreover, the court held that "by demonstrating the market for Boston Scientific securities was efficient during the Class Period, [plaintiff] has adequately shown that the fraud-on-the market theory will provide a viable form of proof in this case."  *Id.* at 287.  Accordingly, the holding of *Boston Scientific* solidly supports Plaintiff's position that inquiry into the merits of Plaintiff's ability to prove loss causation is not appropriate at this juncture of the litigation and has no bearing on the applicability of the "fraud-on-the-market" presumption of reliance.

[26] Similarly displaying Defendants' fundamental ignorance of the relevant law, the argument that S&W's disclosures cannot be curative because they are "forward-looking" borders on the ridiculous.  *See* Defs.' Mem. at 31-32.  The statutory "safe harbor" sometimes prevents a plaintiff from successfully alleging that "forward-looking" statements are actionable as *false statements*.  *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 162 (D. Mass. 2009) (noting that forward-looking statements are only actionable if they were made with actual knowledge of their falsity).  Obviously, Plaintiff has *not* alleged that Defendants' curative disclosures were *false*.  To the contrary, Plaintiff alleged that they incrementally revealed the *truth*.  Thus, by definition, "safe harbor" protections plainly do not apply.

### C.   Common Questions Definitively Predominate over Individual Questions Related to Loss Causation

#### 1.   *There are No Individual Questions of Loss Causation*

Although Defendants portray loss causation as an insurmountable hurdle at this juncture, the vast weight of authority holds otherwise.  Simply put, questions of loss causation are manifestly common to the class.  *See, e.g., Credit Suisse*, 253 F.R.D. at 29-30 ("Once the [fraud-on-the-market] presumption attaches, all other questions of loss causation are common to the class."); *Boston Scientific*, 604 F. Supp. 2d at 287 ("It is sufficient at this stage to conclude that the [loss causation] issues raised by defendants . . . are fully susceptible of common proof.").  Accordingly, there can be no dispute that common questions predominate over individual issues of loss causation.

#### 2.   *Plaintiff has Adduced Basic Facts Demonstrating Its Ability to Prove Loss Causation at Trial*

Even if Plaintiff were required to submit basic facts demonstrating its ability to prove loss causation – which it is not – Plaintiff easily clears that hurdle.  The event study conducted by Plaintiff's expert confirms that the disclosures identified in the Complaint almost certainly caused the declines in S&W's stock price.  Specifically, the Company's stock price plummeted $7.97 per share, or 40%, on October 30, 2007, the day after S&W's first disclosure (October 29, 2007) that partially corrected prior misstatements by reducing S&W's FY 2008 guidance from $0.63 per share to $0.53 per share due, in part, to a lack of product demand.  *See* Preston Declaration, ¶¶38, 47, 60.  Similarly, S&W's stock price dropped another $2.84 per share, or 29%, on December 7, 2007, the day after S&W again lowered its FY 2008 guidance from $0.53 per share to $0.40 per share, in part because the Company admitted that the previously announced lack of product demand actually extended to handguns – a core S&W product.  *Id.* ¶¶38, 49-52, 61-66.

28

Significantly, there was no other material news concerning S&W on those days that could account for those drops. *Id.* ¶¶60 n.22, 67 n.23.  Accordingly, Plaintiff's event study found that the October 30 and December 7 price drops were not correlated with the movement of the stock market as a whole or with an index of companies comparable to S&W and, consequently, that there was *less than a 1% chance* that the price decline was due to something other than Defendants' disclosures. *Id.* ¶¶47, 52, 60, 67.

The combination of those facts amply demonstrates that loss causation exists here, *e.g.,* that Defendants' disclosures caused the drop in the price of S&W's stock, which, in turn, caused Plaintiff and other Class members to lose money.[27]  As a result, Plaintiff has shown that common questions predominate over individual issues of loss causation.[28]

### III.   PLAINTIFF'S CLAIMS ARE TYPICAL OF CLASS MEMBERS' CLAIMS

A plaintiff satisfies the typicality requirement of Rule 23 when "its injuries arise from the same events or course of conduct as do the injuries of the class" and "its claims are based on the same legal theory as those of the class." *Boston Scientific*, 604 F. Supp. 2d at 282; *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 325 (D. Mass. 1997) (same).

---

[27] There is no substance to Defendants argument that Plaintiff has failed to prove loss causation because it cannot identify any corrective disclosure. *See* Defs.' Mem. at 31-32.  First, the argument is flatly irrelevant to Plaintiff's class certification motion because it simply raises another question that is common to the entire class. Yet even if this Court were to consider the argument on the merits – which it should not – the argument completely lacks credibility.  As shown in the Preston Declaration, both the October 29 and December 6 disclosures materially reflect the truth that had been obscured by Defendants' fraudulent statements throughout the Class Period concerning demand for S&W's products, including long guns (October 29 disclosure) and handguns (December 6 disclosure).  Moreover, the additional lowered guidance on both days was attributable, in part, to the fact that the Company's product demand was not what Defendants had claimed it was. *See* Preston Declaration, at ¶62; *see also In re ICG Comm'ns, Inc. Sec. Litig.*, Civil Case No. 00-RB-1864, 2006 U.S. Dist. LEXIS 6695, at *30 (D. Colo. Feb. 7, 2006) (holding that announcements of downward guidance can act as corrective disclosures because "announcements of substantially reduced earnings expectations . . . reasonably can be seen as revelation of the negative truth about [Defendant's] business.").

[28] Defendants' argument that the proposed class is "overbroad" because those who bought and sold during the Class Period did not suffer any loss under *Dura*, *see* Defs.' Mem. at 32-33, is a complete *non sequitur*.  Plaintiff is seeking to represent those who purchased S&W's common stock between June 14 and December 6, 2007 *"and were damaged thereby"*– *i.e.*, those who bought at an inflated price and sold after the truth was revealed and the Company's stock price declined. *See* Pls.' Mem. at 1 (emphasis added).

29

Although Defendants claim that "Plaintiff is subject to a myriad of unique defenses," Defs.' Mem. at 9, the only challenge they articulate is to claim that Plaintiff is subject to a unique defense because it purchased S&W's stock after the first partially corrective disclosure on October 29, 2007.[29] Defs.' Mem. at 23-25. That argument, however, rises and falls on the faulty premise that the October 29 announcement was not a partially curative disclosure, as Plaintiff has alleged, but rather fully disclosed Defendants' fraud. *Id.* at 30-31. As shown herein, Plaintiff has set forth basic facts demonstrating that it can prove that Defendants' October 29, 2007 announcement was only a ***partial*** disclosure. *See supra* Section II.B.2. Indeed, whereas the October 29, 2007 statement acted as the first public disclosure that S&W had reduced guidance from $0.63 per share to $0.53 per share based on lower than expected consumer demand for hunting products, the second disclosure revealed for the first time that S&W had reduced guidance by another $0.13 per share (from $0.53 per share to $0.40 per share) in part because the decreased demand related to handguns was well. *See* Preston Declaration, ¶¶61-64. Accordingly, as Plaintiff's expert opined, the December 6 revelation included new and material information that significantly diminished the value of S&W's stock and caused Plaintiff and the Class to lose money. *Id.* ¶61-67. Hence, it is the proper end date of the Class Period.[30] As a result, Defendants' "typicality" argument lacks a sound foundation in fact and should be summarily dismissed.

---

[29] Although Defendants' brief conflates the "adequacy" and "typicality" analysis, none of their *ad hominem* attacks on Plaintiff's qualifications, even if true, would act as a "unique defense."

[30] Defendants' argument that Plaintiff is "atypical" because a portion of the Fund's purchases were made after a partial disclosure also has no solid foundation. *See, e.g., In re Sepracor Inc.*, 233 F.R.D. 52, 56 (D. Mass. 2005) (holding that purchasing after a disclosure that caused the stock price to drop does not make an investor atypical); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137-38 (5th Cir. Tex. 2005) (same and collecting cases). Even if this Court were to accept Defendants' false assumptions and conclude that the Class Period ended on October 29, 2007, Plaintiff would still be an adequate class representative. *See, e.g., Yang v. Odom*, No. 02-5968, 2005 U.S. Dist. LEXIS 18089, at *17 (D.N.J. Aug. 16, 2005) (citing cases).

## CONCLUSION

For all of the reasons stated herein, and for the reasons discussed in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Class Certification, this Court should grant the Motion for Class Certification, appoint Oklahoma Firefighters to serve as class representative, and approve Plaintiff's choice of Berman DeValerio to serve as Lead Counsel.

Dated:  April 5, 2010                    Respectfully submitted,

                                         By:  **BERMAN DEVALERIO**

                                         By:    /s/ Bryan A. Wood
                                         Glen DeValerio, BBO#122010
                                         Bryan A. Wood, BBO# 648414
                                         Jason M. Leviton, admitted *Pro Hac Vice*
                                         One Liberty Square
                                         Boston, Massachusetts 02109
                                         Tel.: 617-542-8300
                                         Fax:  617-542-1194
                                         Email: *bwood@bermanesq.com*

                                         **Lead Counsel for Lead Plaintiff Oklahoma
                                         Firefighters Pension and Retirement System**

## CERTIFICATE OF SERVICE

I, Bryan A. Wood, hereby certify that the foregoing document and its accompanying supporting documents, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as nonregistered participants by first class mail on April 5, 2010.

                                  /s/ Bryan A. Wood
                                  Bryan A. Wood

31