UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
IN RE SMITH & WESSON HOLDING          )          C.A. No. 07-30238
CORP. SEC. LITIG.                                )
_____)

**Declaration of Candace L. Preston in Support of Plaintiff's Motion for
Class Certification**

I.  Assignment

1.       I have been retained in connection with this matter by Lead Plaintiff's

counsel ("Counsel").  In particular, Counsel requested that I review, evaluate and discuss

the efficiency of the market for Smith &Wesson ("S&W" or the "Company") and loss

causation related to the misstatements and omissions alleged in the Consolidated Class

Action Complaint (the "Complaint") in this matter.  My opinions in this matter are based

in part upon information obtained by Counsel through their investigation to date, and are

subject to supplementation and/or revision in light of additional information that may

come to light through further discovery.

II.  Qualifications

2.       A copy of my curriculum vitae is attached as Exhibit A.  A summary of

the matters in which I have rendered testimony either at trial or in a deposition within the

last four years is attached as Exhibit B.

3.       To summarize my qualifications, I am a graduate of Eastern Michigan

University and received an MBA from the Wharton School of Finance, University of

Pennsylvania.  I am a founding member of Financial Markets Analysis, LLC ("FMA").

FMA is a valuation and securities analysis firm with offices located in Princeton, New

Jersey and San Diego, California.  FMA provides valuation, financial analysis and related

consulting to its clients.  FMA personnel have frequently been called upon to prepare

reports and to testify as experts in class actions under federal and state securities laws.

Such testimony has regularly included market efficiency, the materiality of information

conveyed to investors, loss causation, the valuation of publicly traded securities based

upon the absence of alleged misstatements and/or the disclosure of alleged omissions and

misrepresentations, and damages caused by the alleged misstatements and omissions.

     4.     Prior to joining FMA I was a managing director at BNY Capital Markets,

Inc. ("BNY"), a wholly owned subsidiary of the Bank of New York.  At BNY, I was the

managing director responsible for valuations done in conjunction with fairness opinions,

mergers and acquisitions, private financings and other investment banking projects.

     5.     Prior to joining BNY I was a founding partner of Triumph Partners, LLC

("Triumph"), a valuation and consulting firm.  Before founding Triumph, I was an

executive vice president of Princeton Venture Research, Inc.

     6.     FMA is being compensated in this matter based on the number of hours

expended at the rates charged for personnel, which range from $75 to $450 per hour, plus

out-of-pocket expenses.  My hourly rate is $450.  Our compensation is in no way

contingent upon the outcome of this matter.

III.   <u>Summary of Opinions</u>

     7.     It is my opinion that:  the market in which S&W ("S&W") common stock

traded was open, well-developed, active and impersonal; [1] ii) S&W common stock was

widely owned and traded by numerous market participants; iii) information about the

---

[1] Throughout the Class Period, S&W's common stock traded on the NASDAQ Global Select (NASDAQ GS) under the ticker SWHC.

Company was readily available and disseminated to market participants; and iv) the price of S&W common stock rapidly reflected new, relevant publicly available information concerning the Company.  Therefore, it is my opinion that the market for S&W common stock during the Class Period can be characterized as efficient.  It is further my opinion that information released by the Company after the market closed on October 29, 2007 and December 6, 2007 was material, disclosed the materialization of the effects of the alleged misstatements and omissions and caused the price of S&W stock to decline and investors to suffer losses.

IV.  <u>Support for Opinions</u>

8.  My opinions are based upon my professional knowledge and experience, a comprehensive review of data, documents and information relevant to this matter, and an analysis of the available trading information and relevant market information for S&W common stock. In forming my opinions I considered the following:

a.  Pleadings
   i.  the Complaint;
   ii.  the Memorandum and Order regarding Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (the "MTD Order");
   iii.  the Memorandum of Law in Support of Plaintiff's Motion for Class Certification;
   iv.  Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification; and
   v.  the Declaration of John A. Sten in support of Defendant S&W Holding Corp.'s Opposition to Plaintiff's Motion for Class Certification.

b.  Other Documents and Data
   i.  Daily stock price and volume data for S&W common stock as well as other share information;
   ii.  Daily stock price data for other companies in the firearms and leisure finance industries during the Class Period;
   iii.  Bid and ask quotation data for S&W common stock and other companies obtained from the NYSE Trade and Quote Database;

    iv.  Information regarding holders of S&W common stock, including holdings by Company insiders and reporting institutional investors during the Class Period;

    v.  S&W's filings with the Securities Exchange Commission ("SEC") including Forms 10-K, 10-Q, 8-K and Proxy Statements;

    vi.  Analyst reports written about the Company and other companies competing in the firearms and leisure industries during the Class Period;

    vii.  News articles and press releases disseminated about the Company and the industry during the Class Period;

    viii.  Industry and market index data including index constituents and daily index values during the Class Period; and

    ix.  Transcripts of S&W's earnings conference calls with investors.

V.  <u>Defining an Efficient Market</u>

9.    The concept of an "efficient" market evolved from the Ph.D. dissertation of Eugene Fama.  Dr. Fama made the argument that in an active market that includes many well-informed and intelligent investors, securities prices will reflect all available information.[2]  The concept of market efficiency has been studied extensively following Dr. Fama's initial work.  The Efficient Market Hypothesis (the "EMH") postulates there are three forms of market efficiency -- weak, semi-strong and strong.  The three forms of efficient markets are distinguished by the degree of information reflected in securities prices.

10.    The weak form postulates that stock prices reflect information about their past prices, and is widely accepted by market participants.  If markets are weak-form efficient, it is impossible to earn consistent profits by studying past returns alone.  The market is said to "have no memory" regarding past stock prices.  At the other end of the spectrum is the perfectly efficient market (strong-form efficient).  In a strong-form efficient market, stock prices reflect all information about a stock, including non-public

---

[2] Fama, Eugene F., "Random Walks in Stock Market Prices," *Financial Analysts Journal*, September/October 1965.

information.  Market participants generally agree that strong-form efficiency is an ideal, with very little real-world existence.

11.     The semi-strong form of efficiency postulates that stock prices reflect all public information.  In markets that are semi-strong efficient, stock prices adjust rapidly to public information.  The speed with which a stock price adjusts to new information depends upon the nature of the new information and how quickly one is able to digest the implications of the information.  In my opinion, the relatively rapid inclusion of new, relevant information in the price of a security is the most reliable indication of market efficiency.

12.     Financial analysts typically examine a number of factors to determine market efficiency including the number and depth of market participants, the availability of information about the security, and, most importantly, the responsiveness of the security price to the disclosure of new information.

13.     Case law precedent also exists on the indicators of market efficiency.  The court in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) listed five factors to be considered in determining whether the market for a given stock is efficient.  The Cammer factors are as follows:

     a.  whether the stock was actively traded, as evidenced by a large weekly volume of stock trades, such as an average weekly turnover of one or two percent of the outstanding shares;

     b.  whether a significant number of securities analysts followed and reported on the stock during the class period;

     c.  whether the stock had numerous market makers;

     d.  whether the Company was eligible to file a Form S-3 ("short-form") Registration Statement in connection with public offerings of securities; and

  e. the existence of empirical facts that show a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price.[3]

14. The following sections address the five factors outlined in <u>Cammer</u> and show that S&W satisfies each relevant criterion and that its stock should be presumed to have traded in an efficient market.

   A. <u>S&W's Shares Were Actively Traded Throughout the Class Period</u>

15. During the Class Period, there were approximately 40 million S&W common shares outstanding.  Company insiders owned approximately 20 percent of the common shares outstanding during the Class Period.  The remaining 80 percent of the shares were held by institutional investors, including mutual funds, banks, pension funds, investment management firms, and individual investors

16. According to S&W's 2007 Form 10-K, there were 572 "holders of record" of its common stock as of July 13, 2007.  There were many more beneficial owners of the shares.  "Holders of record" are owners whose shares are held in the owner's name.  Most investors do not hold their shares in their own names, but rather prefer to leave them in "street name."  Shares held in "street name" are generally held in the name of a stock brokerage, a bank or other nominee, rather than the customer's name, for ease of trading.  Shares held in street name do not need to be hand delivered and signed when the investor decides to sell them.  A shareholder who holds shares in street name is considered to be the beneficial owner of these shares but not the shareholder of record.

17. I examined the historical quarterly holdings of S&W's common stock by reporting institutional investors.  There were over 200 institutions that held shares of the

---

[3] See: <u>Cammer</u>, 711 F. Supp. at 1287-88.

Company's common stock during the Class Period.  Institutions holding S&W common stock during the Class period include banks, investment advisors, pension funds and research firms.  As previously mentioned, many of these institutions held shares on behalf of individual investors.  It is my opinion, based on this data, that S&W's common stock was widely owned and traded by numerous market participants during the Class Period.

18.     I examined the average weekly trading volume relative to the number of shares outstanding.[4]  Overall, the average weekly volume was 5,865,950 shares.  The turnover as a percentage of average shares outstanding during the Class Period was 14.6 percent, far exceeding the benchmark provided by <u>Cammer</u> of one to two percent, and demonstrating that an active market in the shares was present during the Class Period.

B.    <u>Information Regarding S&W and Its Stock Was Widely Available to the Investment Community through Securities Analysts and Other Sources</u>

19.     At a minimum, analysts at the following investment banking and research firms issued reports on S&W during the Class Period:  Cowen & Company, Merriman Curhan Ford, Rodman & Renshaw, ThinkEquity Partners, D.A. Davidson & Co., and Wedbush Morgan Securities, Inc.  In total, I have found more than 30 research reports issued about S&W during the Class Period.  These analysts closely followed S&W's financial performance and prospects, and issued recommendations on its stock.  These analyst reports were available to the public and the investment community through brokers as well as various electronic databases including Bloomberg, Investext, First Call, Reuters, Dow Jones and the Lexis/Nexis database. A list of those reports, by date, as compiled by Thomson Financial and Reuters, is attached hereto as Exhibit C.  In

---

[4] I obtained weekly trading volume for S&W common stock from Bloomberg for the weeks ended June 15, 2007 through December 7, 2007.

addition, PriceTarget Research, Inc., Thomson StreetEvents, RiskMetrics Group, Corporate Technology Information Services, Inc., Data Monitor, NewConstructs, LLC, and ISS all issued information and updates about S&W during the Class Period.

20.     The Company took affirmative steps to inform the investing public about its activities.  During the Class Period, S&W issued numerous press releases reporting various activities of the Company, including its financial performance and the results of its marketing and expansion program.   These press releases were made available to the investing public through newspapers, electronic newswires and databases, and through the Internet.  The Company also hosted regular conference calls for analysts and other investors in conjunction with the release of its quarterly financial results throughout the Class Period.  These calls were broadcast telephonically and transcripts of the calls were available through electronic news services such as Bloomberg and Dow Jones.  In addition, S&W made presentations at investment analyst and industry conferences, including conferences hosted by Merriman Curhan Ford, Think Equity Partners and Stephens.

21.     The Cammer decision does not specifically quantify what constitutes a "significant" number of analysts; however, at least one court in the First Circuit found that just one analyst can be sufficient to satisfy this requirement.[5]  It is my opinion that the multitude of Company-specific activities and reports issued by the firms listed and discussed above constituted significant coverage of S&W and its common stock during the Class Period and supports the assumption of an efficient market for S&W stock.

22.     Trading data, including stock prices and share volume for S&W common stock was disseminated throughout the investment community in newspapers, through

---

[5] See, for example, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005).

electronic systems such as Bloomberg, and over the Internet.  Accordingly, current information concerning transactional prices for the sale and purchase of S&W's common stock was readily available to the market and to investors.

23.     In addition to these sources of information, S&W was required to make filings with the SEC.  Filings made by the Company provided important information to the market, including business conditions affecting the Company's financial performance and other matters affecting its stock price.  I have attached as Exhibit D a listing of S&W's SEC filings made during the Class Period.

24.     Through the SEC filings and other reports to shareholders, the many financial analysts who followed the stock and issued reports during the Class Period, and through the Company's own distribution of press releases and information concerning its business, there was a steady and readily obtainable flow of information concerning the Company that was made available to the investment community and to the market.  The flow of information from analysts and the Company supports the assumption of an efficient market for S&W stock.

C.     S&W Common Stock Traded on the NASDAQ Global Select Market and Had Numerous Market Makers during the Class Period

25.     S&W's common shares have been listed for trading on the NASDAQ GS since July, 2006.  On July 1, 2006 the NASDAQ National Market was renamed the NASDAQ Global Market.  The NASDAQ GS market is a segment of the NASDAQ Global Market with more rigorous listing standards than the NASDAQ Global Market.  "The NASDAQ Global Select Market has the highest initial listing standards in the world. Approximately 1,200 companies are listed on the Global Select, having met these

stringent financial and liquidity requirements for initial listing and continue to meet

stringent financial, liquidity and corporate governance requirements."[6]

26.     The NASDAQ GS is home to such companies as Microsoft, Qualcomm,

eBay, Costco, and Starbucks.  In discussing the Company's decision to list its shares on

the NASDAQ GS, the Company's President and CEO, Michael F. Golden stated as

follows:

> I am extremely pleased to announce our move to the NASDAQ, and specifically to the newly established Nasdaq Global Select Market with its higher listing standards.  We believe that this trading environment will provide greater recognition for Smith & Wesson, as well as increased liquidity and value for our stockholders. (PR Newswire, July 10, 2006)

27.     Trading on the NASDAQ GS is facilitated by market makers through an

electronic exchange.  The securities listed on NASDAQ GS have a number of competing

securities firms that make a market in their stock. These market makers compete with one

another by buying and selling for their own accounts over NASDAQ's electronic trading

network.  The NASDAQ electronic trading system, with its competing market makers,

enables efficient, instantaneous transactions in the shares listed and traded on the

exchange.  During the Class Period there were over 30 market makers that participated in

making a market in S&W stock.  I have attached as Exhibit E a list of the firms that made

a market in S&W stock from June 2007 through December 2007.

28.     Securities that trade on certain US exchanges are generally presumed to be

efficient given a number of factors including the depth and liquidity of these markets and

the listing and reporting requirements imposed by the exchange.

> "We think that, at a minimum, there should be a presumption – – probably conditional for class determination – – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American

---

[6] http://www.nasdaq.com/reference/glossary.stm

Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."  *Cammer*, 711 F. Supp. at 1292 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).

29.     Based on the above information, it is my opinion that the fact that S&W common stock traded on the NASDAQ GS market and had numerous market makers throughout the Class Period supports the assumption of an efficient market for S&W common stock.

### D.   Ability to File Form S-3 When Registering Securities

30.     Another indication that information about a company is widely available to the public is the company's eligibility to file a "short-form" registration statement, Form S-3, ahead of its offering of securities for sale to the public.  Registrants that qualify to use a short-form registration statement have, among other things, satisfied disclosure and dissemination of information requirements, and market capitalization requirements, prior to the filing of the registration statement in question.  If a company meets the requirements to file with a short-form registration statement, it may incorporate its other company filings by reference rather than by attachment.

31.     Before the beginning of the Class Period, on March 12, 2007, S&W filed a Form S-3 registering 6,485,084 shares of common stock and 4% Senior Convertible Notes due 2026 with a face value of $80,000,000.  An amendment to this Form S-3 was filed on Form S-3/A during the Class Period on June 22, 2007.   At least as early as 2005 and continuing after the Class Period, through 2009, S&W filed Forms S-3.  Thus, the Cammer criteria of being able to use the simplified registration form when registering securities is satisfied and supports the assumption of an efficient market for S&W common stock.

E.  Empirical Facts Show a Cause and Effect Relationship Between Unexpected Corporate Events and a Rapid Response in S&W's   Stock Price

32.     The most telling indication of market efficiency is whether the price of the security quickly responds to new, relevant information.  In 1969, Fama, Fisher, Jensen and Roll pioneered the use of "event studies" in their paper regarding the adjustment of stock prices to announcements of stock splits.[7]  Event studies generally involve the comparison of the day-to-day percentage change in the price of a company's stock (known as the "return") that results from the disclosure of new information.  The comparison is generally done using a statistical tool known as "regression analysis."  The subject stock price return is typically compared to a "normal" or "expected" return.  The regression analysis generally calculates the relationship between the historical stock price returns of the company and the returns of a market and/or industry index, known as a "market model."[8]  The expected return is calculated by applying an equation generated by regression analysis.[9]   Regarding event studies and the use of daily stock price data Fama concluded, "When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response – the central issue for market efficiency."[10]  Event studies are useful in examining the cause and effect relationship between unexpected corporate events and changes in the stock price.

[7] Fama, Eugene F., Fisher, Lawrence, Jensen, Michael C., and Roll, Richard, "The Adjustment of Stock Prices to New Information," *International Economic Review*, Vol. 10, No. 1, February 1969.

[8] See, e.g., J. Campbell, A. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets, Princeton University Press* (1997), p. 156.

[9] The regression analysis produces slope coefficients, called "betas," that quantify the relationship of a security's return to the returns of the market and industry indexes.  A security with a market beta of 0.5 is expected to increase (or decrease) by half of a percent for every one percent increase (decrease) in the market.

[10] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, Vol. XLVI, No. 5, December 1991.

33.     One generally begins an event study by identifying the events in question and by defining the event window.  As Fama suggested, when the subject company's stock is traded in an efficient market, an event window of one-day, measured as the price change from the close of trading on day t-1 to day t, is both practical and generally accepted.  The types of events that one might expect to cause a change in the value of the company and, as a result, the market price of its stock, include, but are not limited to: unexpected (positive or negative) earnings announcements, changes in dividend policy, merger or acquisition announcements, and changes in analysts' opinions regarding the security.

34.     I conducted a search of the electronic archives of news articles pertaining to S&W during the Class Period through Bloomberg and Dow Jones Factiva.  The search resulted in thousands of pages of news articles, which my staff consolidated and entered into an Excel spreadsheet, aligned with the date, S&W's closing stock price, and reported trading volume to create an event chronology (attached as Exhibit F).  I carefully reviewed the event chronology and selected several of the news items, or events, which I posited might have caused a significant change in the price of S&W's common stock. Security prices, in general, would not be expected to exhibit significant returns when information entering the market is consistent with previously disclosed information, or is anticipated by market participants.  I focused my attention on unexpected announcements or revelations of new information that might impact the price of S&W's common stock.

35.     An event study involves using the regression equation to predict a normal return for the security during the event window and a comparison of the predicted return to the actual return for the security.  The difference between the predicted return and the

actual return is known as the excess return or "residual" return.  A market model such as the one that I employed in this matter is a generally accepted, widely used method to generate the predicted returns and to obtain estimates of residual returns.[11]

36.    The approach of this methodology is to use the statistical method of linear regression to extract market-wide and industry effects from the effects of company-specific events.  I employed standard statistical measures to test for significant company-specific price changes over a one-day event window.  Finally, statistical testing is performed in order to determine whether the residual return is statistically "significant." If the subject return is outside of the stock's normal volatility range, it is said to be "significant." The degree of confidence in the significance is measured by how far the subject return is outside of a stock's normal volatility range, for example, one or two standard deviations from the mean.  The indicator of this confidence level is known as the "t-statistic."[12]  In considering whether certain residual returns for S&W common stock were statistically significant, I applied a t-statistic of 1.96, which indicates with 95 percent confidence that the price movements were not observed "by chance."

37.    In order to control for general market and industry factors affecting S&W's stock price, I developed several market models which quantified the mathematical and statistical relationships between changes in the price of S&W's common stock and changes in the NASDAQ Composite Index ("NASDAQ Index") and

---

[11] See, e.g., MacKinlay, A.C., "Event Studies in Economics and Finance," Journal of Economic Literature, Vol. XXXV (March 1997) pp.13-39.

[12] Reliable regression equations depend on the sample data having a "normal" distribution; i.e., when graphed, the data form a bell-shaped curve.  The curve has two "tails" which are the far left and far right of the bell-shaped curve. A two-tailed test allows for data falling either to the right or left of the middle of the curve.  In a two-tailed test, 95 percent of the area under the bell curve occurs within approximately two standard deviations of the mean value, with 2.5 percent remaining on the far left and 2.5 percent remaining on the far right.

changes in the prices of Sturm Ruger & Co. ("Sturm Ruger"), Taser International, Inc. ("Taser") and an index of firms to which S&W was compared in analyst reports ("Comparable Index"). Each regression analysis included 122 observations, encompassing the daily returns for the period from June 14, 2007 through December 6, 2007.[13] I found that movements in the NASDAQ Index provided the best explanation of movements in the price of S&W stock. If another variable such as Sturm Ruger, Taser or the Comparable Index, was included in the analysis with the NASDAQ Index, the results were virtually identical to the NASDAQ Index results without another variable. On their own, each of the other variables was a much less robust explanatory factor than was the NASDAQ Index. The analysis produced the regression equation shown below:

| *Regression Statistics* | | | *Coefficients* | *Standard Error* | *t Stat* |
|---|---|---|---|---|---|
| Multiple R | 0.4016 | Intercept | 0.0010 | 0.0029 | 0.3281 |
| R Square | 0.1613 | CCMP | 1.1167 | 0.2324 | 4.8043 |
| Adjusted R Square | 0.1543 | | | | |
| Standard Error | 0.0324 | | | | |
| Observations | 122 | | | | |

38.     Using the regression equation described above, I calculated daily predicted and residual returns for S&W's common stock on the selected event days. If the residual return was statistically significant at the 95 percent level, having a t-statistic of 1.96 or greater, then I concluded that S&W's stock price responded in a meaningful way to the company-specific information or event, independent of changes in the market and industry index. The table below shows the selected events in this study, the actual, predicted, and residual returns on those event days, and the t-statistic for the residual returns.

―――――――――――――――

[13] I did not include the return for October 29, 2007 in my regression analysis as it is one of the days cited in the Complaint as being a partial disclosure.

| Date | S&W Price | S&W Return | NASDAQ | NASDAQ Return | Predicted Return | Residual Return | T-Statistic | Event |
|---|---|---|---|---|---|---|---|---|
| 6/14/2007 | $14.91 | | 2599.41 | | | | | Smith & Wesson Holding Corp. said Thursday its fiscal fourth-quarter profit grew 24 percent, aided by strong handgun sales and an acquisition.  Raising guidance for FY 2008. |
| 6/15/2007 | $16.15 | 8.32% | 2626.71 | 1.05% | 1.27% | 7.05% | 2.17 | |
| 9/6/2007 | $20.04 | | 2614.32 | | | | | Q1 EPS rose to $0.11 from $0.08 a year earlier.  Raising guidance again for FY 2008. |
| 9/7/2007 | $21.06 | 5.09% | 2565.70 | -1.86% | -1.98% | 7.07% | 2.18 | |
| 10/8/2007 | $19.17 | | 2787.37 | | | | | |
| 10/9/2007 | $20.83 | 8.66% | 2803.91 | 0.59% | 0.76% | 7.90% | 2.44 | Law Enforcement Associates received orders for four of its Under Vehicle Insipection Systems during the past week.  Three of the orders are for the Company's protable S&W branded UVIS Swift. |
| 10/29/2007 | $20.09 | | 2817.44 | | | | | Preliminary financial results for Q2, problems with hunting season.  Lowering guidance for the rest of the year. |
| 10/30/2007 | $12.12 | -39.67% | 2816.71 | -0.03% | 0.07% | -39.74% | -12.25 | |
| 11/19/2007 | $11.17 | | 2593.38 | | | | | |
| 11/20/2007 | $10.42 | -6.71% | 2596.81 | 0.13% | 0.24% | -6.96% | -2.15 | Supreme Court to hear gun case.  Could have larger implications for the second amendment. |
| 12/6/2007 | $9.92 | | 2709.03 | | | | | Q2 results announced.  Problems in handgun market revealed.  Guidance lowered. |
| 12/7/2007 | $7.08 | -28.63% | 2706.16 | -0.11% | -0.02% | -28.61% | -8.82 | |

## Discussion of Selected Events

39.     On June 14, 2007, after the close of trading, S&W announced earnings for the fourth quarter ended April 30, 2007 and held and a news conference discussing its announcement.  The earnings announced were above analysts' expectations.  In addition, the Company raised its fiscal 2008 forecast.  Associated Press Newswires ("AP") reported that "S&W Holding Corp. said Thursday its fiscal fourth-quarter profit grew 24 percent, aided by strong handgun sales and an acquisition."

40.     During the June 14, 2007 conference call Mr. Golden "walked [you] through the success we've had in fiscal 2007 in our core handgun markets."[14]  In addition, Mr. Golden said "Now let me take a few minutes to talk about our future.  In

---

[14] S&W June 14, 2007 Earnings Conference Call transcript.

fiscal 2008 we will continue to execute upon our strategy to become a global leader ...We will grow our core handgun business…"[15]  In response to a question by Cowen Advisors analyst Tony Leesa, Mr. Golden stated, "…let's talk about handguns first, okay?  The sporting goods channel you should assume that we will grow our business in the sporting goods channel at a double-digit rate, in about the mid teens."[16]

41.     During the June 15, 2007 conference call, S&W CFO John Kelly commented on the fact that the Company had raised its earnings guidance for Fiscal Year 2008.  In response to a question from Rodman and Renshaw analyst Amit Dayal about the reason for the confidence in the increase and if the guidance was conservative, Mr. Kelly stated: "[W]ell the guidance we put out is, we don't have any, as we said, any federal government, large federal government contracts in it…So we are putting all of those things together and that's why we reacted confidently with our new guidance."[17]

42.     In response to the Company's June 14, 2007 earnings announcement and conference call analysts issued positive reports.  For example on June 15, 2007 Eric Wold of Merriman Curhan & Ford issued a report entitled "Blasts a Bulls-eye with 4Q Results Well Above Expectations and Then Quickly Reloads by Increasing FY08 Guidance."

43.     In response to the earnings release and conference call, both of which took place after the market closed on June 14, 2007, the price of S&W common stock had a residual return of 7 percent on June 15, 2007 with a t-statistic of 2.17, indicating statistical significance at greater than the 95 percent level.  This is consistent with the

---

[15] Id.
[16] Id.
[17] Id.

presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

44.     On September 6, 2007, after the close of trading, S&W announced earnings for the first quarter ended July 31, 2007 and held and news conference discussing its announcement.  The earnings announced were above analysts' expectations.  In addition to reporting its first quarter earnings, the company increased its guidance for net income for FY 2008.  CFO John Kelly stated that "this increase in our annual earnings projections from our previously announced guidance reflects the stronger than anticipated First Quarter performance."[18]

45.     In response to the earnings release and conference call, both of which took place after the market closed on September 6, 2007, the price of S&W common stock had a residual return of 7 percent on September 7, 2007 and a t-statistic of 2.18, indicating statistical significance at greater than the 95 percent level.  This is consistent with the presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

46.     On October 9, 2007 Law Enforcement Associates Corporation ("LEAC") announced that it had received orders for three portable S&W brand Under Vehicle Inspection Systems ("UWIS").  LEAC President Paul Feldman stated: "We entered into our S&W licensing relationship with the primary objective of capturing new U.S.-based market opportunities….we are very encouraged by the momentum we are building."  In response to this announcement S&W common stock had a residual return of 8 percent on October 9, 2007 and a t-statistic of 2.44, indicating statistical significance at greater than

---

[18] S&W September 6, 2007 Earnings Conference Call transcript.

the 95 percent level.  This is consistent with the presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

47.     On October 29, 2007, S&W announced preliminary second quarter results which were below analysts' expectations and reduced guidance for the remainder of FY 2008.  The announcement shocked the market.  In response to the October 29, 2007 preliminary earnings announcement, which took place after the market closed, S&W common stock had a residual return of negative 40 percent the next trading day, October 30, 2007, and the t-statistic was negative 12.25, indicating statistically significance at greater than the 99 percent level.  This is consistent with the presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

48.     On November 20, 2007, the U. S. Supreme Court announced that one of the cases it had accepted involved the right of Washington D.C. to ban handguns.  A federal appeals court had previously struck down the ban and the possibility of its reinstatement and a possible proliferation of handgun bans as a result of a Supreme Court ruling had very negative implications for S&W.  As a result of this announcement, Smith and Wesson common stock had a residual return of negative 7 percent and the t-statistic was negative 2.15, indicating statistical significance at greater than the 95 percent confidence level.  This is consistent with the presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

49.     On December 6, 2007, after the close of trading, Smith and Wesson announced its earnings for the second quarter ended October 31, 2007 which were in line with the October 29, 2007 announcement.  In addition, S&W reduced its guidance going forward.  The Company also held a conference call in conjunction with the

announcement after the close of the market.  In the earnings press release, President and

CEO Michael Golden stated:

> The second quarter was a challenging one for the sporting goods
> channel...Within the consumer channel, the reduced retail activity not only
> affected long guns but handguns as well…Early feedback on our handgun
> promotions, designed to clear S&W product from the sales channel has been
> positive.  However, industry-wide channel inventories remain high, limiting
> the ability of both distributors and dealers to purchase products and thereby
> limiting our sales.

50.     During the December 6, 2007 conference call CFO John Kelly said,

"S&W handgun orders have improved and retail point of sale information lead [sic] to

believe that the correction for S&W is nearing an end."[19]

51.     Also during the December 6, 2007 conference call, in response to a

question asked by Merriman Curhan & Ford analyst Eric Wold, President and CEO

Michael Golden stated, "specifically our handgun promotions are working fairly well and

we have a some experience at that, which is helping to take the inventory down, because

there is a lot of S&W inventory out there at the beginning of the second half also…"[20]

Speaking of handguns, he continued, "[W]e think that there will be some promoting of

the product to move the product, to clear, it probably, it won't all go away, but to clear it

going into next year."[21]

52.     In response to the December 6, 2007 earnings announcement and

conference call, both of which took place after the market closed, S&W common stock

had a residual return of negative 29 percent the next trading day, December 7, 2007, and

the t-statistic was negative 8.82, indicating statistically significance at greater than the 99

---

[19] Smith and Wesson December 6, 2007 Earnings Conference Call transcript.
[20] Id.
[21] Id.

percent level.  This is consistent with the presumption that, in an efficient market, stock prices rapidly adjust to reflect new, relevant information.

53.     Based on my event studies and analysis of the cause and effect relationship between unexpected company-specific events and significant changes in S&W's stock price, it is my opinion that the market for S&W common stock was efficient.

VI.   Materiality and Loss Causation

54.     In general, a fact is "material" if there is a substantial likelihood that a fact would alter reasonable investor's perception of the total mix of information and an investor would consider the fact to be important in deciding whether to invest in the company.   Since investment decisions virtually always consider the price of the investment, one of the most straightforward measures of materiality of information is whether or not such information would alter the price of an investment.

55.     In this matter plaintiff alleges that the Company "knowingly misled investors into believing that strong consumer demand for its products supported the rosy financial outlook that the Company issued at the start of the Class Period."

56.     As shown above in the discussion of efficiency, when S&W announced its earnings on June 14, 2008 it raised its financial guidance for FY 2008.  In general, stock prices are forward looking.  That is, what causes stock prices to change is not what has happened in the past per se, but what that portends for the future.  When a company reports good results and those results support growth in the future that the company forecasts, the stock price rises.

57.     When S&W reported its results on June 14, 2007 it attributed much of the increase in its results to strong handgun sales.  Such an attribution fit with the fact that S&W is the largest manufacturer of handguns in the United States and the largest U.S. exporter of handguns. Analysts accepted that explanation and the representation that handguns would fuel further growth in FY 2008.  For example, Cal von Ruhmor, and analyst for Cowen & Company reported on June 15, 2007, "Q4 EPS of $0.12 came in $0.02 over consensus on sales of $82.6 MM (+22% 'organic'), $8 MM over our est., led by robust sports channel handgun/tactical rifle sales…FY08 Est. Hiked Again on Sports Channel Vigor."

58.     The increase in guidance given by S&W after the market closed on June 14, 2007, caused S&W common stock to increase the following day with a residual return of over 7 percent, which was statistically significant at greater than the 95 percent level. This increase in price demonstrates the materiality of the future guidance given by S&W and the market's response to that guidance.

59.     On September 6, 2007, after the market closed, S&W again increased its earnings guidance for FY 2008.  Because of its importance to the market, as shown above, analysts questioned why there was increased optimism on the part of the Company.   The increased guidance and the responses to questions regarding that guidance caused the price of S&W common to increase the following day with a residual return of over 7 percent, which was statistically significant at greater than the 95 percent level.  This increase in price demonstrates the materiality of the future guidance given by S&W and the market's response to that guidance.

60.    On October 29, 2007, after the market closed, Smith and Wesson reduced its earnings guidance of FY 2008.  There was no conference call that accompanied this announcement.  This announcement was the first indication that the financial guidance given by Smith and Wesson was not accurate.  This announcement caused the price of S&W common stock to decrease the following day and suffer a residual decline of 40%, which was statistically significant at greater than the 99 percent level.[22]  The price decrease on October 30, 2007 demonstrates the materiality of the future guidance that had been given by S&W and caused investors to suffer losses.

61.    On December 6, 2007, after the market closed, Smith and Wesson reported the results of the Company's second fiscal quarter ended October 31, 2007 and again lowered its guidance for the remainder of FY 2008.  This was the first time that the market saw the full materialization of the previously undisclosed risks regarding the true financial prospects of Smith and Wesson.

62.    As stated above, reports of past earnings are important in that they support or undermine expectations about future profitability.  In this case, S&W reported earnings that were largely in line with those pre-announced on October 29, 2007, but revealed weaknesses beyond the causes discussed in conjunction with the October 29, 2007 announcement.  This was the first time the market realized the extensive inventory glut related to handguns, the heart of S&W's business.  During the December 6, 2007 conference call CEO Michael Golden tried to put a positive spin on the excess handgun inventory and its ramifications. He said:

---

[22] Based on my examination of the documents and data cited in Paragraph 8b, I saw no indication that any other information entered the market regarding S&W after the market closed on October 29, 2007 through October 30, 2007 which would account for the decline in S&W stock.

> We believe that an approximate 20% inventory correction began late in
> the third quarter of calendar 2007, will start to bring industry-wide
> inventory levels back into line with market demand.  Smith & Wesson
> handgun sales have improved…What we are hearing is that our
> promotion, specifically our handgun promotions are working fairly well
> and we have some experience at that , which is helping to take inventory
> down, because there was a lot of Smith & Wesson inventory out there at
> the beginning of the second half…

63.     Analysts responded to this information.  On Eric Wold of Merriman
Curhan & Ford wrote:

> **We Were Wrong.  Another Shoe Dropped…**
>
> - **Channel weakness expected to linger through Q3…**It now looks as
>   though sales trends and inventory trends will not fully correct until Q4.

64.     On December 10, 2007, James Maher of ThinkEquity wrote:

> We believe Smith & Wesson has built inventory that will take some time
> to clear out.  Inventory is typically close to 40% of the following quarter's
> sales, but ended Q2 at approximately 90% of our estimate of Q3 sales.
> We think management's visibility for industry sales to distributors and
> retailers' final sales remains challenged…

65.     In addition, the December 6, 2007 announcement called into question
management's credibility regarding any forecasts.  For example, reporting on the
December 6, 2007 announcement and conference call, D.A. Davidson analyst Reed
Anderson wrote:

> **Shot Through the Heart!  Rapid Deterioration in Fundamentals and
> Lack of Visibility Prompt Downgrade to NEUTRAL.**
> - **Results in line with pre-release…**
> - **Decoupling from guidance.**  Visibility is clearly much more
>   limited that we had previously believed, based on rapid reduction in
>   management's guidance over the past six weeks.  While the factors
>   causing the current softness (i.e., high distributor inventories) may
>   make sense, we struggle with the timing of these discoveries and, as a
>   result, feel management's ability to forecast with any degree of
>   precision is quite limited… [Emphasis in the original.]

66.   On December 7, 2007 ThinkEquity analyst James Maher wrote:

…this guidance [FY 2008] was based upon the belief that distributor's [sic] inventory buildup would be largely cleared during Q3 and the Q4 would return to more nearly normal conditions.  We believe the current challenges may persist longer…

67.   In response to the problems revealed in the December 6, 2007 earnings release and conference call, S&W common stock had a residual decline of 29%, which was statistically significant at the greater than 99 percent level.[23]  The price decrease following the December 6, 2007 announcement demonstrates the materiality of the future guidance that had been given by S&W and caused investors to suffer losses.

68.   Based on the above analysis, it is my opinion that the guidance Smith and Wesson gave to the market throughout the Class Period was material and directly affected the price that reasonable investors were willing to pay for Smith and Wesson common stock.  Positive changes in the guidance given by S&W caused the price to increase and investors to pay more for Smith and Wesson stock than would have been the case without such changes in guidance.  The corrections of the alleged misrepresentations and omissions caused Smith and Wesson common stock to decline dramatically and investors to suffer losses.

VII.   <u>Summary and Conclusion</u>

69.   It is my opinion that during the Class Period:

a.   the market for S&W  common stock was efficient;

b.   The alleged misstatements and omissions were material in that they would have affected the total mix of information available about S&W; and

---

[23] Based on my examination of the documents and data cited in Paragraph 8b, I saw no indication that any other information entered the market regarding S&W after the market closed on December 6, 2007 through December 7, 2007 which would account for the decline in S&W stock.

c. That the alleged misstatements and omissions and their corrections caused investors in Smith and Wesson common stock to suffer losses.

Candace L. Preston, CFA
April 5, 2010